*GEICO v. Mayzenberg*

# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2023

(Argued:  February 15, 2024   Decided:   November 12, 2024)

Docket No. 22-2537

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, GEICO CASUALTY COMPANY,

*Plaintiffs-Appellees,*

−v.−

IGOR MAYZENBERG, MINGMEN ACUPUNCTURE, P.C., SANLI ACUPUNCTURE, P.C., LAOGONG ACUPUNCTURE, P.C.,

*Defendants-Appellants,*

TAMILLA DOVMAN, AKA TAMILLA KHANUKAYEV, IGOR DOVMAN, JOHN DOE

*Defendants.*[*]

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.   When Defendants-Appellants originally filed this appeal, their case was consolidated with an appeal filed by Defendants Igor Dovman and Tamilla Dovman.   Since then, the Dovmans have settled with Plaintiffs-Appellees and voluntarily dismissed their appeals under Federal Rule of Appellate Procedure 42.   The Dovmans' appellate case is now closed.

LIVINGSTON, *Chief Judge*, LYNCH, AND ROBINSON, *Circuit Judges*.

---

This appeal raises an important, but unsettled, question of state law concerning New York's "no-fault" auto insurance system. Plaintiffs-Appellees—four insurance entities commonly known as GEICO—presented evidence that the Defendants-Appellants—whom we collectively call the "Mayzenberg Defendants"—paid third parties for referring patients who were eligible for medical benefits under their no-fault insurance coverage to Defendant Mingmen, P.C. Under 11 N.Y.C.R.R. § 65-3.16(a)(12) (the "Eligibility Regulation"), an insurance company can deny reimbursement to a provider of health care services for no-fault benefits if the provider "fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . ." Here, we must decide whether, by paying third parties for patient referrals in violation of New York's rules of professional misconduct, Mingmen has "fail[ed] to meet" a "licensing requirement" within the meaning of the Eligibility Regulation.

GEICO says yes. GEICO characterizes the patient referrals as an illegal "kickback" scheme, arguing that when a provider breaches its ethical duties, it necessarily violates the underlying terms of its licensure. In turn, under the Eligibility Regulation, the provider would not be entitled to receive no-fault payments.

The Mayzenberg Defendants disagree. They argue that paying for patient referrals may constitute professional misconduct, thereby subjecting the provider to licensure-related consequences, but does not constitute violation of a "licensing requirement" under the Eligibility Regulation. The Mayzenberg Defendants suggest that a "licensing requirement" refers to registration paperwork filed with the state to secure or maintain a license.

The United States District Court for the Eastern District of New York (Glasser, *J.*), agreed with GEICO. On cross motions for summary judgment, it awarded GEICO declaratory judgment on the question. The district court also granted GEICO summary judgment on its common law claim of fraud and statutory claims under the Racketeer Influenced and

Corrupt Organizations Act, 18 U.S.C. § 1962, largely based on the same conclusions about Mingmen's ineligibility to receive assigned no-fault insurance benefits. The Mayzenberg Defendants appealed.

Because we cannot confidently predict how the New York Court of Appeals would interpret the Eligibility Regulation in this context, we hereby **CERTIFY** a question to that Court.

---

BARRY I. LEVY (Michael A. Sirignano, Henry M. Mascia, Steven T. Henesey, *on the brief*), Rivkin Radler LLP, Uniondale, NY *for Plaintiffs-Appellees*.

MATTHEW J. CONROY, Schwartz, Conroy & Hack, PC, Garden City, NY, *for Defendants-Appellants*.

---

ROBINSON, *Circuit Judge*:

This appeal raises an important, but unsettled, question of state law concerning New York's "no-fault" auto insurance system. Plaintiffs-Appellees Government Employees Insurance Company and three affiliated entities (collectively, "GEICO") presented evidence that Defendants-Appellants Igor Mayzenberg and two of his businesses—Laogong Acupuncture, P.C., ("Laogong") and Sanli Acupuncture, P.C. ("Sanli")—paid third parties "kickbacks" for referring patients who were eligible for medical benefits under their no-fault insurance coverage to another Mayzenberg-owned business, Mingmen Acupuncture, P.C., ("Mingmen"). Mingmen then provided medical services and

3

billed GEICO. In this opinion, we collectively refer to all four Defendants-Appellants as "the Mayzenberg Defendants."

The first question presented by the parties' cross-motions for summary judgment is whether the summary judgment record viewed in the light most favorable to the Mayzenberg Defendants establishes as a matter of law that the Mayzenberg Defendants paid third parties for patient referrals to Mingmen. If so, the second question—the unsettled question of New York law—is whether those facts render Mingmen ineligible to receive no-fault medical benefits from GEICO.

Under 11 N.Y.C.R.R. § 65-3.16(a)(12) (the "Eligibility Regulation"), an insurance company can deny reimbursement to a provider of health care services for no-fault benefits if the provider "fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . ." If GEICO has established that Mingmen—through Mayzenberg, Laogong, and Sanli—paid third parties for patient referrals, in violation of New York's rules of professional misconduct, the legal question is whether Mingmen "fail[ed] to meet" a "licensing requirement" within the meaning of the Eligibility Regulation.

GEICO says yes. According to GEICO, complying with the state's standards of professional conduct is necessary to maintaining a license. Thus, if

4

a provider pays "kickbacks" for patient referrals in breach of its ethical duties, Appellee's Br. at 26, the provider necessarily violates the underlying terms of its licensure and cannot receive no-fault reimbursements.[1]

The Mayzenberg Defendants disagree. They suggest that when the Eligibility Regulation talks about a "licensing requirement," it refers to registration paperwork filed with the state to obtain or maintain a license. They also argue that GEICO's reading would allow insurance companies to engage in all sorts of delay tactics to avoid paying no-fault claims.

The United States District Court for the Eastern District of New York (Glasser, *J.*), agreed with GEICO as to both the facts and the law. It granted GEICO's motion for summary judgment and entered a declaratory judgment absolving GEICO of any obligation to pay Mingmen's pending claims. *See Government Employees Insurance Company v. Mayzenberg*, 2022 WL 5173745, at *13 (E.D.N.Y. Aug. 24, 2022) (declaring that "Mingmen is ineligible for reimbursement on its pending no-fault claims . . . ."). The district court also granted GEICO summary judgment on its common law claim of fraud and its statutory claims

---

[1] Unless otherwise noted, when we quote the parties' briefs, the summary judgment evidence, and caselaw, we omit all internal quotation marks, alterations, footnotes, ellipses, and citations.

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, both of which flowed from the same legal analysis. *Id.* at \*13–14.

The Mayzenberg Defendants appealed, challenging the district court's rulings on the declaratory judgment and fraud claims. They argue that GEICO failed to demonstrate that any kickbacks for referrals actually occurred here. They also contend that *even if* they had paid referral fees, or "kickbacks" for patient referrals, that would not be a basis to deny payment for Mingmen's medical services or to recoup payments already made.

We conclude that the undisputed facts, taken in the light most favorable to the Mayzenberg Defendants, establish that they paid referral fees to third parties. What's less clear is whether that ethical violation renders Mingmen ineligible to receive payments for no-fault benefits.

To date, the New York Court of Appeals has not decided whether engaging in a patient-referral scheme constitutes a failure to satisfy a "licensing requirement" under the Eligibility Regulation. A handful of decisions from New York's intermediate appellate and trial courts considering related "licensing requirements" have reached inconsistent outcomes. Because we cannot confidently predict how the New York Court of Appeals would rule on this issue, which underlies the various counts within the judgment that the Mayzenberg

Defendants challenge on appeal, and because this question is a frequently recurring one that potentially requires assessment of public policy considerations in a highly regulated industry, we hereby **CERTIFY** a question to the New York Court of Appeals.

## BACKGROUND

Below, we begin with an overview of New York's no-fault insurance system before considering the relevant facts and procedural history of this lawsuit.

### I.     New York's No-Fault Insurance System

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act and its implementing regulations, auto insurance companies must provide "no-fault benefits" to policyholders.   *See* N.Y. Ins. Law §§ 5101, 5103(a) *et seq.;* 11 N.Y.C.R.R. §§ 65-1.1(a) *et seq.*   These benefits require insurance companies to pay up to $50,000 per insured for "basic economic loss[es]," which encompass "necessary" "professional health services" like hospital care, dental work, and physical therapy.   N.Y. Ins. Law § 5102(a)(1).   If a service is medically necessary, an insurance company must pay for it, even if the policyholder was at fault for the automobile accident (hence the "no-fault" nomenclature).   *Montgomery v. Daniels*, 38 N.Y.2d 41, 46–47 (1975).

7

New York enacted these measures to displace most of the state's common law tort regime for injuries arising from automobile accidents. *See Matter of Medical Society of State of N.Y. v. Serio*, 100 N.Y.2d 854, 860 (2003). In so doing, the legislature hoped that the no-fault system would ensure prompt compensation for individuals injured in motor vehicle accidents without regard to fault, reduce litigation burdens on the courts, and lead to premium savings for New York motorists. *Id.*; *see also Montgomery*, 38 N.Y.2d at 50–51 (explaining that, under the common law system, litigation "was excessively and needlessly expensive and inefficient," that one quarter of injured persons "received no compensation whatsoever," and for those who received compensation, "minor injuries were often overcompensated").

Under the Act's implementing regulations, insureds can assign their no-fault benefits to healthcare providers, who, in turn, can bill the insurance company directly and receive payment. 11 N.Y.C.R.R. § 65-3.11(a)–(b). "To guarantee that insureds are promptly compensated, the regulations also establish[] strict, and brief, time periods for claim processing." *State Farm Mut. Auto Ins. Co. v. Mallela*, 372 F.3d 500, 503 (2d Cir. 2004) ("*Mallela I*"); *see also Presbyterian Hosp. in City of N.Y. v. Maryland Cas. Co.*, 90 N.Y.2d 274, 285 (1997) (describing the claims

8

processing period as "short-leashed" and "designed to avoid prejudice and red-tape dilatory practices").

For example, if an insurer wants to verify a claim, it must send specific forms to the provider within 10 business days of receiving an application for no-fault benefits. 11 N.Y.C.R.R. § 65-3.5(a). An insurer that seeks additional verification to establish proof of the claim must make the request within 15 business days of receiving the completed verification forms. *Id.* § 65-3.5(b). Such additional verification may include an "examination under oath" of the assignee healthcare provider or a medical examination of the insured. *See id.* § 65-3.5(d)–(e); *IDS Prop. Cas. Ins. Co. v. Stracar Med. Servs., P.C.*, 116 A.D.3d 1005, 1006–07 (2d Dep't 2014) (examination under oath); *Boulevard Multispec Med., P.C. v. Tri-State Consumer Ins. Co.*, 43 Misc.3d 802, 802–03 (N.Y. Dist. Ct. 2014) (medical examination).

Once the insurer receives adequate evidence of proof of loss, it must pay benefits within 30 calendar days. N.Y. Ins. Law § 5106(a); 11 N.Y.C.R.R. § 65-3.8(a)(1). If it fails to do so without good cause, the insurer will owe interest and reasonable attorneys' fees. N.Y. Ins. Law § 5106(a). Plus, if the insurer fails to adhere to this 30-day deadline, it will be precluded from raising most defenses in any subsequent lawsuit. *See Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10

9

N.Y.3d 556, 563 (2008) (explaining that, except in one "narrow" circumstance, insurers are generally precluded from asserting a defense against payment); *Presbyterian Hosp.*, 90 N.Y.2d at 285–86 (insurer precluded from asserting intoxication exclusion defense).

Critical to this appeal is the Eligibility Regulation, which an insurer can invoke as a ground to investigate a claim further and to deny payment.[2] The Eligibility Regulation says:

> A provider of health care services is not eligible for reimbursement under [N.Y. Ins. Law § 5102(a)(1)—the no-fault statute] if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

11 N.Y.C.R.R. § 65-3.16(a)(12). Notably, the Eligibility Regulation does not define the term "licensing requirement." We consider New York caselaw applying the Eligibility Regulation, and its implications for this case, in more detail below.

---

[2] In the litigation context, an insurer can invoke the Eligibility Regulation offensively or defensively. It depends on who sues first. For example, if a healthcare provider sues an insurer to compel reimbursement, the insurer can raise the Eligibility Regulation as an affirmative defense. *See, e.g.*, *Huntington Regional Chiropractic, P.C. v. Allstate Ins. Co.*, 40 Misc.3d 978, 981 (N.Y. Dist. Ct. Nassau Cty. 2013). On the flipside, if the insurer gets to the courthouse first, it can sue the provider and seek a declaratory judgment that the provider is not entitled to payment because it did not satisfy a licensing requirement under the Eligibility Regulation. *See, e.g.*, *Liberty Mut. Ins. Co. v. Raia Med. Health, P.C.*, 140 A.D.3d 1029, 1030 (2d Dep't 2016).

## II. Factual Background

At the time of the parties' cross-motions for summary judgment, Mayzenberg was a naturalized U.S. citizen living in Brooklyn, New York. He was licensed to practice acupuncture, and he is the sole owner of Mingmen, Laogong, and Sanli—three acupuncture professional services corporations ("PCs") formed under New York law. Of these three PCs, only Mingmen treated patients between January 2012 to February 2019, the relevant time period for this lawsuit. Laogong and Sanli, on the other hand, have not treated a patient since 2012 and 2011, respectively.

From January 2012 to February 2019, Mingmen treated more than 1,300 individuals injured in motor vehicle accidents who were eligible for no-fault benefits. It filed nearly $4.9 million in no-fault claims with GEICO, of which nearly $3.2 million remained outstanding as of February 2019.

Although Mingmen was the only PC actively treating patients during this time period, Mayzenberg's two other PCs—Laogong and Sanli—made payments to others via check. Of these check recipients, the most prominent in the record and the most discussed in the briefing are a group of entities owned and controlled by Igor Dovman and his spouse, Tamilla Dovman. The record shows that the Dovmans served as the president or owner of at least twenty-three companies (the

11

"Dovman Companies") that received payments from Laogong and Sanli. Igor and Tamilla Dovman were also the signatories for the Dovman Companies' bank accounts.

Between September 2015 and August 2017, Laogong and Sanli paid the Dovman Companies nearly $390,000, often in installments exceeding $10,000. Even though Laogong and Sanli paid the Dovman Companies large sums of money, the Dovman Companies never sent Laogong, Sanli, or Mingmen an invoice that described what these payments were for. Instead, an unidentified person would call Mayzenberg every month and tell him how much to remit. When Mayzenberg wrote the checks, he sometimes left the "pay to the order" section blank and let an unknown person fill in that line. He also left the "memo" or "for" lines blank for all the checks. Mayzenberg explained that he left portions of his checks blank because he struggles with English spelling and grammar. He simply wrote the amount due as directed and let someone else fill out the remaining sections so that the payments would go smoothly.

Mayzenberg claims that he paid the Dovman Companies through Laogong and Sanli to do legitimate advertising work for Mingmen. Notwithstanding this explanation, Mayzenberg could not identify *any* advertising activities undertaken by the Dovman companies. Mayzenberg did not have copies of any flyers, nor

could he name a newspaper in which a supposed advertisement ran for Mingmen. He also did not know whether the Dovman Companies had any phone number and could not name a person associated with a Dovman Company. Additionally, none of the Dovman Companies paid any identifiable employees, legitimate vendors, government agencies, or tax collectors. They did not own or lease any office space, and they did not maintain a website or social media presence advertising their services. And, for at least three Dovman Companies, the certificate of incorporation used someone else's name as an incorporator, when, in fact, the named incorporators never authorized the use of their identity for such purposes.

In addition, a few Dovman Companies bore names suggesting they did not engage in any advertising work at all, such as "ML Garbage Removal, Inc.," "MN Surgical Supplies, Inc.," and "Rig Testing and Supply, Inc." When pressed about the incongruity of paying a garbage removal company for marketing, Mayzenberg responded, "I don't care what the name of the company is. . . . If garbage removal company can find people, people in garbage there, and sends them to the clinic, I don't care how garbage company is called." App'x at 175.

And when asked why Laogong and Sanli paid the Dovman Companies, as opposed to Mingmen (the purported beneficiary of the advertising work),

13

Mayzenberg said that was easier for him. Because Mingmen treats the patients, it was "an overload of a company" that required him to issue many checks for many expenses. App'x at 136. In his view, because all three PCs belonged to him, it didn't matter where the money came from.

During discovery, when GEICO sought information from Igor Dovman, he repeatedly invoked his Fifth Amendment privilege against self-incrimination. For example, in response to interrogatories that asked him to identify the nature of his relationship with the Mayzenberg Defendants and to describe the business activities of each Dovman Company, Igor Dovman invoked the Fifth Amendment. He did the same during his deposition, in which he was asked whether he had ever received payment from the Mayzenberg Defendants in exchange for patient referrals. In fact, Igor Dovman declined to answer *any* of the questions about any of his companies, including whether he was the president of them.

In addition to paying the Dovman Companies, Mayzenberg's inactive PCs also paid four others—a personal injury attorney named Daniel Corley, a salon owner named Desiree Reid, and two entities named Nina Brouk Advertisement and Dona Catalina Marketing. On twelve occasions, Sanli issued checks to Corley, which were deposited into his attorney operating account. Corley's account also issued 197 checks—a total of $1.4 million—to companies owned by

14

Igor Dovman.   Curiously, the checks issued from Corley's attorney operating account bore Igor Dovman's handwriting.   When GEICO asked Corley about his attorney operating account in a deposition, Corley invoked his Fifth Amendment privilege.   And when GEICO asked Corley about whether he ever referred his personal injury clients to providers in exchange for payments, Corley, again, invoked his Fifth Amendment privilege.

The record evidence regarding the checks to Desiree Reid, Nina Brouk Advertisement, and Dona Catalina Marketing is less robust, and the details are not particularly relevant to our decision to certify.[3]

## III.   District Court Proceedings

In 2017, GEICO filed its original complaint against the Mayzenberg Defendants, which was later superseded by an amended complaint.   Of the eight claims asserted in the amended complaint, only four are before us: GEICO's claim for declaratory judgment, its New York common law claim of fraud, and its two statutory RICO claims—a civil RICO conspiracy and a substantive RICO violation.

---

[3] The parties also dispute whether Mingmen's services were medically necessary.   GEICO says many weren't.   For purposes of the summary judgment ruling on appeal, which turns on Mingmen's eligibility to receive no-fault benefits and not the medical necessity of the services it provided or the reasonableness of its no-fault claims, we assume that the services for which Mingmen billed GEICO were reasonable and medically necessary.

GEICO's claim for declaratory judgment sought a declaration that Mingmen could not receive payment for its pending no-fault claims.

The declaratory judgment claim is premised on the factual assertion that Mingmen improperly paid fees for patient referrals, and the legal assertion that under the Eligibility Regulation, this conduct renders Mingmen ineligible to receive no-fault benefits as the assignee of its insured patients. As to its claim of fraud, GEICO alleges in relevant part that Mayzenberg and Mingmen falsely represented that Mingmen could receive no-fault payments, when, in fact, it was not entitled to such reimbursement by virtue of its participation in a patient referral scheme.[4] As for its RICO claims, GEICO alleged that Mayzenberg repeatedly committed mail fraud, in violation of 18 U.S.C. § 1341, and his inactive PCs conspired to further this criminal enterprise. The theory of RICO fraud relevant to this appeal is the same as GEICO's theory of common law fraud described above. Lastly, GEICO alleged Mayzenberg and Mingmen unjustly enriched themselves when they received payments for no-fault benefits they were not entitled to.

---

[4] GEICO's amended complaint identifies multiple material misrepresentations and omissions to support its claim of fraud. However, it only moved for summary judgment on one alleged misrepresentation—that Mingmen falsely represented it could receive no-fault payments, even though it had engaged in a patient referral scheme. *See Mayzenberg*, 2022 WL 5173745, at *5. Thus, only this theory of liability is before us on appeal.

16

After discovery closed, GEICO and the Mayzenberg Defendants filed cross motions for summary judgment. The district court ruled in GEICO's favor, awarding it summary judgment on all claims except unjust enrichment. *See Mayzenberg*, 2022 WL 5173745, at *13–14. The district court first concluded that there was no genuine dispute that the Mayzenberg Defendants paid the Dovmans and others for improper patient referrals. *Id.* at *5. In the district court's view, Mayzenberg's "bare assertion[]" that he paid the Dovman Companies for legitimate advertising work did not create a triable issue of fact. *Id.*

Because it concluded that the patient referral scheme violated a licensing requirement, the district court held that under the Eligibility Regulation, Mingmen was disqualified from receiving any no-fault payments. *Id.* The court thus issued a declaratory judgment that absolved GEICO of any duty to pay Mingmen's outstanding no-fault claims. *Id.* at *7.

These initial rulings formed the basis for the district court's subsequent ones. Because Mingmen was ineligible for no-fault payments, the district court granted summary judgment on GEICO's claim of common law fraud. *See id.* at *8–9. It explained that when Mingmen submitted its claims to GEICO, it knowingly omitted a material fact—that Mingmen got its patients through an unethical patient referral arrangement. *Id.* The district court then found that, as a matter

17

of law, the evidence conclusively showed Mingmen intended for GEICO to rely on that omission to its detriment. *Id.* at *8. Because a reasonable factfinder could not find for the Mayzenberg Defendants, the district court granted summary judgment on GEICO's claim of fraud. *Id.* at *9.

So too with GEICO's RICO claims. *See id.* at *12–13. In the district court's view, there was no genuine dispute that Mayzenberg engaged in a pattern of racketeering when he repeatedly mailed fraudulent no-fault claims to GEICO, in violation of the federal mail fraud statute. *Id.* at *11–12. It also found that Mayzenberg, Laogong, and Sanli conspired to further this racketeering enterprise when they funneled money to the Dovman Companies. *Id.* at *13.

Lastly, because New York law does not permit recovery on an unjust enrichment claim that is duplicative of a conventional tort claim, the district court dismissed the unjust enrichment claim as moot. *Id.* at *13 (citing *Scifo v. Taibi*, 198 A.D.3d 704, 706 (2d Dep't 2021)). Given its rulings in GEICO's favor, the district court denied the Mayzenberg Defendants' cross-motion for summary judgment, *id.* at *14, and this timely appeal followed.

## DISCUSSION

The Mayzenberg Defendants make two main arguments on appeal: (1) there is a genuine issue of material fact as to whether the Mayzenberg Defendants paid

18

fees for patient referrals, and (2) paying for patient referrals, in violation of New York Education Law § 6530(18) and 8 N.Y.C.R.R. § 29.1(b)(3), does not disqualify a provider from receiving no-fault payments under the Eligibility Regulation.

With respect to the first argument—the factual one—we agree with the district court that based on the summary judgment evidence, a rational factfinder would be compelled to conclude that the Mayzenberg Defendants paid fees to third parties for patient referrals.   The second question—the legal one—is a close one.   For the reasons set forth below, we certify the question to the New York Court of Appeals.

## I.    The Factual Question

"We review without deference the district court's grant of summary judgment when, as here, the parties filed cross-motions for summary judgment and the district court granted one motion but denied the other."   *Loomis v. ACE American Insurance Company*, 91 F.4th 565, 572 (2d Cir. 2024).   "Summary judgment is proper when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law."   *Id.*   And where a movant has shown the existence of a material fact and the nonmovant wishes to challenge it, the nonmovant bears the burden of production to point to "significant probative evidence" (that is, more than "a scintilla of evidence") from which a reasonable

19

factfinder could find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 252 (1986).

Here, there is no genuine dispute about the fact that the Mayzenberg Defendants paid the Dovmans for patient referrals to Mingmen. The parties don't dispute the following: For almost two years, Mayzenberg's clinically inactive PCs paid the Dovman Companies nearly $390,000. Although Mayzenberg insists that these payments were for general advertising and marketing work, Mayzenberg had no invoices or flyers to support this factual assertion. Nor could Mayzenberg point to a single individual from the Dovman Companies with whom he had contact about the supposed advertising work. Plus, not only is the summary judgment record bereft of any named employee who did advertising work, the record undisputedly shows the Dovman Companies paid no employees. Nor did they pay any vendors, government agencies, or tax collectors. The Dovman Companies did not own or lease any office space, and they did not maintain any website or social media presence to show that any entity did advertising work.

Moreover, Mayzenberg essentially admitted that he paid the Dovman companies to send him patients. When asked about a check written to a Dovman company named "ML Garbage Removal, Inc.," he said, "I don't care what the

name of the company is. . . . If garbage removal company can find people, people in garbage there, and sends them to the clinic, I don't care how garbage company is called." App'x at 175. This admission, coupled with his inability to furnish sufficient evidence to contradict GEICO's evidence, entitles GEICO to judgment as a matter of law on the factual issue in this case—whether Mayzenberg paid the Dovmans for patient referrals.

Although the Mayzenberg Defendants dispute these facts, they have not met their burden of production to create a triable issue over them. *See McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) ("[T]he nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor."). Mayzenberg's bare assertion that the Dovman Companies did advertising work, unsupported by any detail or evidence, and contradicted by the undisputed evidence about the nature of the Dovman Companies as well as his own admission, is insufficient to create a disputed issue of fact.

Because the Mayzenberg Defendants have failed to point to more than "a scintilla" of evidence sufficient to create a triable issue of fact, *Anderson*, 477 U.S. at 252, and no rational factfinder could find for the Mayzenberg Defendants on this issue, the district court did not err in assessing the facts for purposes of its summary judgment ruling.

## II.    The Legal Question

The legal question is tougher—that is, whether paying for patient referrals, in violation of New York Education Law § 6530(18) and 8 N.Y.C.R.R. § 29.1(b)(3), disqualifies a provider from receiving no-fault payments under the Eligibility Regulation. [5]    Considering the regulatory framework and New York court decisions, we cannot confidently predict how the New York Court of Appeals would decide this question.    Because the question frequently arises in litigation and raises important public policy considerations that impact a highly regulated industry, we opt to certify rather than deciding the question ourselves.

### A.  The Statutes and Regulations at Issue

Recall that the Eligibility Regulation says a provider cannot receive no-fault reimbursements if it "fails to meet any applicable New York State or local licensing requirement necessary to perform [the services it's licensed for] in New York." 11 N.Y.C.R.R. § 65-3.16(a)(12).   Relevant here, Title VIII of New York's Education Law, which regulates physicians, acupuncturists, and other healthcare providers,

---

[5] In passing, the parties' briefs cite another statute prohibiting medical referral businesses: New York Public Health Law § 4501, which says: "No person . . . shall engage in for profit any business or service which in whole or in part includes the referral or recommendation of persons to a . . . health related facility . . . for any form of medical . . . care or treatment of any ailment or physical condition.").   Because they have not adequately briefed how this statutory provision applies to Mingmen, and whether it does or does not qualify as a licensing requirement, we deem any argument tied to this statute abandoned.   *United States v. Donziger*, 38 F.4th 290, 306 n.17 (2d Cir. 2022) (declining to address inadequately briefed arguments raised in passing).

says the following will constitute professional misconduct: "Directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services." N.Y. Educ. Law § 6530(18). An implementing regulation says the same. *See* 8 N.Y.C.R.R. § 29.1(b)(3). And if New York's state board for professional medical conduct finds a licensee guilty of violating this prohibition on paying for patient referrals, the board can suspend, revoke, or annul the license. N.Y. Pub. Health Law § 230-a(2), (4)–(5).

### B. New York Caselaw

To date, the New York Court of Appeals has issued two decisions addressing the scope of the Eligibility Regulation: *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 320–21 (2005) ("*Mallela II*") and *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 33 N.Y.3d 389, 404 (2019). These decisions explain that PCs owned and controlled by people *outside* of the PCs' practice area have failed to meet a necessary "licensing requirement" under the Eligibility Regulation. *Mallela II*, 4 N.Y.3d at 319–22; *Carothers*, 33 N.Y.3d at 393–94, 397, 403–07. *See also* N.Y. Bus. Corp. Law §§ 1507(a), 1508(a) (imposing restrictions on PC ownership and control). They do not address the Eligibility Regulation's application to providers who violate the rules of professional conduct for healthcare providers.

23

We have located only one decision from New York's intermediate appellate courts and three from its trial courts that touch upon that question. As reflected below, these decisions give us guidance, but do not clearly resolve the issue before us.

1. Mallela I and II

In *Mallela I*, an insurer sued several individuals and PCs in federal court, alleging that nonphysicians fraudulently incorporated the PCs by paying doctors to use their names in the PCs' registration paperwork, even though the nonphysicians actually owned and operated the companies. 372 F.3d at 503–04. The insurer argued that the PCs' fraudulent incorporation disqualified them from receiving reimbursement under the Eligibility Regulation. *Id.* at 504. The district court dismissed the insurer's operative pleading, *id.* at 502, and on appeal, we certified to the New York Court of Appeals the following question: "Is a medical corporation that was fraudulently incorporated . . . entitled to be reimbursed by insurers, under New York Insurance Law §§ 5101 *et seq.*, and its implementing regulations, for medical services rendered by licensed medical practitioners?" *Id.* at 509.

The New York Court of Appeals said no. *Mallela II*, 4 N.Y.3d at 320. Citing the Eligibility Regulation, the Court of Appeals concluded that if the insurer's allegations were true, the defendant PCs "undisputedly fail[ed] to meet

24

the applicable state licensing requirements, which prohibit nonphysicians from owning or controlling medical service corporations." *Id*. at 320–21. It rejected the argument that PCs were entitled to payment because the patients received necessary medical care from licensed providers operating within the scope of their licenses, explaining that the reimbursement would still go to a medical service corporation that exists solely "because of its willfully and materially false filings with state regulators." *Id*. at 321. In response to the argument that its interpretation of the Eligibility Regulation would undermine the prompt payment goals of the no-fault system, the Court of Appeals deferred to the expertise of the Superintendent of Insurance in adopting a reasonable regulation. *Id*. It held that "on the strength of [the Eligibility Regulation], carriers may look beyond the face of licensing documents to identify willful and material failure to abide by state and local law." *Id*.

Responding to the argument that its interpretation would invite insurers to abuse the verification process authorized by statute, the Court of Appeals explained that by regulation, carriers may delay the payment of claims to pursue investigations solely for "good cause," and in the licensing context, carriers would "be unable to show 'good cause' unless they can demonstrate behavior tantamount to fraud." *Id*. at 322. It continued: "Technical violations will not do.

25

For example, a failure to hold an annual meeting, pay corporate filing fees or submit otherwise acceptable paperwork on time will not rise to the level of fraud."

*Id.*

What's not clear from *Mallela II* is whether its holding reaches only fraudulent conduct connected with the formation and initial licensure or relicensure of a PC, or whether it reaches any conduct that can lead to revocation of an otherwise valid license.

### 2. Carothers

Likewise, *Carothers*, the only other decision from the Court of Appeals on the Eligibility Regulation's reach, does not resolve the issue. *Carothers* was primarily concerned with how a trial court handled a request for a specific jury instruction. 33 N.Y.3d at 400. Like *Mallela II*, *Carothers* involved PCs that were nominally owned by a physician but actually controlled by nonphysicians. *Id.* at 397. During the trial, the PCs requested a jury instruction that would explain the traditional elements of common law fraud. *Id.* at 399. Emphasizing *Mallela II*'s language about conduct that is "tantamount to fraud," the PCs argued an insurer could only deny payment under the Eligibility Regulation if the PCs' conduct satisfied the elements of common law fraud. *Id.* The trial court declined to issue the requested instruction. *Id.* Instead, it told the jury that it could find the PCs

26

were fraudulently incorporated if it found the nonphysicians were either the actual owners of, or exercised substantial control over, the PCs. *Id.*

The Court of Appeals affirmed the trial court's ruling. *Id.* at 405–06. It noted that the confusion over the phrase "tantamount to fraud" likely stemmed from the fact that we, the Second Circuit, used the term "fraudulently incorporated" when we certified our question in *Mallela I*. *Id.* at 405. *Carothers* acknowledged that *Mallela II*'s discussion of the word "fraud" was "misleading," and it clarified that insurers, PCs, and courts should not read too much into *Mallela I*'s use of the word. *Id.* Rather, the focus should center on whether a corporate practice showed a "willful and material failure to abide by licensing and incorporation statutes," which may or may not satisfy the traditional elements of fraud. *Id.* And where a PC fails to abide by such licensing and incorporation statutes, *Carothers* reiterated *Mallela II*'s guidance that insurers can only withhold payment where such violations are "grave" ones rather than merely "technical" ones. *Id.* at 406.

Though *Carothers* reaffirmed that the Eligibility Regulation only authorizes non-payment for sufficiently severe violations, it tells us no more than *Mallela II* about whether the Eligibility Regulation can reach beyond "licensing and

27

incorporation statutes" to professional misconduct that could implicate a provider's licensure.

### 3. Decisions from New York's Intermediate and Trial Courts

The handful of cases from New York's intermediate and trial courts that touch more directly on the question before us yield conflicting answers. In *H & H Chiropractic Servs., P.C. v. Metropolitan Prop. & Cas. Ins. Co.*, a trial court in Queens County essentially rejected an argument similar to the one GEICO presses here. *See* 47 Misc.3d 1075 (N.Y. Civ. Ct. 2015). There, an insurer denied payment because a PC engaged in "impermissible fee splitting," which violated two statutes, New York Education Law § 6509-a and § 6530(19), and one regulation, 8 N.Y.C.R.R. § 29.1(b)(4), that governed professional conduct. *Id.* at 1077.[6] For purposes of its analysis, it appears that the court assumed the PC impermissibly split its fees with a third-party vendor and focused on whether such impermissible

---

[6] Impermissible fee splitting occurs where a licensee permits "any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation," or other qualifying personnel. *See* N.Y. Educ. Law § 6530(19); *see also id.* § 6509-a (prohibiting similar conduct in more specific contexts); 8 N.Y.C.R.R. § 29.1(b)(4) (using similar language as § 6530(19)). In *H & H*, a PC agreed to pay its billing vendor five to six percent of all fees charged and collected. 47 Misc.3d at 1076. The PC disputed that paying its biller a percentage of receivables ceded "any form of ownership or control over the plaintiff." *Id.* at 1077. In reaching its decision, the court did not decide the question of whether the PC's contract with its billing vendor was, in fact, improper.

fee splitting, alone, could render the PC ineligible to receive no-fault benefits under the Eligibility Regulation. *See id.* at 1078–79.

The trial court said no. It first noted that the lawsuit presented a case of first impression. *Id.* at 1077. To the best of its knowledge, all cases involving the "successful[]" use of the Eligibility Regulation involved fraudulent incorporation and never impermissible fee splitting alone. *Id.* at 1078. *H & H* observed that Education Law § 6530 and its accompanying regulation committed punishment for unprofessional conduct to the state board—not the courts. *Id.* And where courts have been asked to review punishment meted by the state board, such review is done through New York's expedited Article 78 proceedings, not a standard civil lawsuit.[7]

*H & H* concluded that "impermissible fee-splitting, standing alone, is not a violation of a licensing requirement, does not constitute an available defense to a no-fault action and, as such, any action is solely within the purview of the appropriate state licensing board." *Id.* at 1079.

___

[7] Article 78 proceedings differ from traditional civil proceedings—which New York calls "plenary civil actions"—by offering "a limited and expedited summary procedure." *Whitfield v. City of New York*, 96 F.4th 504, 520 (2d Cir. 2024). The party initiating the Article 78 proceeding is not automatically entitled to discovery and must seek leave from the court to do so. *Id.* Similarly, parties cannot "be joined or impleaded, and no third-party practice or intervention is allowed, without leave of the court." *Id.*

Both the First Department and a trial court in Bronx County have adopted *H & H*'s approach. *See Matter of Allstate Prop. & Cas. Ins. Co. v. New Way Massage Therapy P.C.*, 134 A.D.3d 495, 495 (1st Dep't 2015); *Harvey Family Chiro PT & Acup, PLLC v. Ameriprise Ins. Co.*, 68 Misc.3d 556, 560 (N.Y. Civ. Ct. Bronx Cty. 2020). In *New Way Massage*, the First Department issued a brief, two-paragraph decision that cited *H & H* and held that impermissible fee splitting alone "does not constitute a defense to a no-fault action." 134 A.D.3d at 495. It explained that consequences flowing from impermissible fee splitting was "solely a matter for the appropriate state licensing board." *Id.* In *Harvey*, a trial court in Bronx County summarily said impermissible fee splitting, alone, did not violate a licensing requirement under the Eligibility Regulation. 68 Misc.3d at 560.

But a trial court in New York County went the other way on this issue. *See HKP Physical Therapy, P.C. v. Government Empls. Ins. Co.*, 67 Misc.3d 282 (N.Y. Civ. Ct. N.Y. Cty. 2019). There, an insurer alleged a doctor wrote medically unnecessary prescriptions, and a colluding pharmacy filled them. *Id.* at 284–85, 290–91. The insurer believed the pharmacy not only dispensed unnecessary medications, but it also conspired with the doctor to engage in an improper patient referral scheme. *Id.* at 285, 299–300. It therefore requested documents so it

30

could verify or dispel its suspicions in processing the pharmacy's no-fault claims. *Id.* at 285, 290–91.

The trial court held that a pharmacy that participates in a patient referral scheme, in violation of Education Law § 6530(18), could be denied payment under the Eligibility Regulation. *See id.* at 300. It reasoned that the Eligibility Regulation said *any* failure to meet a licensing requirement would render a provider ineligible for no-fault payments. *Id.* at 299. Based on this expansive language, *HKP* held that paying for patient referrals was a licensing violation and thus fell within the Eligibility Regulation's scope. *See id.* at 300. *HKP* then concluded the insurer could properly request documentation to further its investigation and dismissed the pharmacy's lawsuit as prematurely filed (that is, the lawsuit would've been ripe if the insurer had actually denied the claim). *Id.* at 300–02.

In light of *H & H*, *New Wave Massage*, and *Harvey*, there's a persuasive argument that the district court should not have entered declaratory judgment for GEICO—especially because *New Wave Massage* is a decision from the First Department of the Appellate Division. *See King v. Aramark Services, Inc.*, 96 F.4th 546, 558 (2d Cir. 2024) ("Absent persuasive evidence that the New York Court of

31

Appeals would reach a different conclusion, we are bound to apply [the statute] as interpreted by the First Department.").

Moreover, *H & H* and *New Wave Massage* make a compelling point that under New York Public Health Law § 230-a, the state has committed the responsibility of disciplining providers to the state board for professional misconduct.  *See H & H*, 47 Misc.3d at 1078; *New Wave Massage*, 134 A.D.3d at 495. To hold that a private entity like an insurance company can use Education Law § 6530 and Public Health Law § 230-a to dispense sanctions for ethical violations would be in tension with the statutory structure.

But *HKP* offers worthy insights of its own.  The Eligibility Regulation disqualifies a provider that "fails to meet *any* applicable New York State or local licensing requirement" from receiving no-fault payments.  11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).  And insofar as loss of licensure is a potential consequence for violating Education Law § 6530(18), isn't compliance with that provision a licensing requirement?

True, extending *Mallela II* and *Carothers* beyond the incorporation and initial licensure or relicensure context could open the door to denying payment based on a large swath of conduct.  For example, Education Law § 6530 also considers the following to be professional misconduct: failing to furnish copies of documents

requested by a patient, revealing a patient's personal information without consent, and advertising "for patronage that is not in the public interest." N.Y. Educ. Law § 6530(22), (23), (27). But the New York Court of Appeals has cautioned that only "grave" violations fall within the Eligibility Regulation's purview. *See Carothers*, 33 N.Y.3d at 406. And that limiting principle could mitigate the potential overbreadth of the *HKP* approach.

GEICO, not surprisingly, aligns with the *HKP* approach. In addition to relying on the terms of the statute, GEICO leans on policy arguments. In GEICO's view, if the Eligibility Regulation's goal is to prevent PCs from morphing into profit-maximizing operations, then that principle should guide our analysis here. That is to say, if PCs controlled by non-physicians are ineligible for no-fault reimbursements because they prioritize personal riches over a patient's quality of care, the same should be true for PCs that pay others for patient referrals. Both practices lead to costly, unnecessary treatment at the expense of insured motorists who ultimately have to pay higher premiums as a result of this misconduct. GEICO also analogizes the manipulative aspects of a fraudulently incorporated PC to those of a patient referral scheme. In the same way that fraudulently incorporated PCs are puppeteered by nonphysicians, patient referral schemes are

subject to an analogous form of marionetting: No payment to the referrer, no patients. No patients, no money.

The Mayzenberg Defendants take a different view that aligns with *H & H.* They emphasize that the prohibition against referral fees is a disciplinary regulation, not a licensing one. Moreover, the Mayzenberg Defendants contend that extending the Regulation's reach to the rules of professional conduct would create perverse incentives on the part of insurance companies, opening the floodgates to an "onslaught of verification requests" to see if a PC has committed *any* form of professional misconduct. Appellant's Br. at 24.

For the reasons set forth below, we conclude that the New York Court of Appeals is better positioned than we are to resolve these competing arguments.

### III. Certification

The New York Court of Appeals authorizes us to certify claim-determinative questions of New York law where there is no controlling Court of Appeals precedent. 22 N.Y.C.R.R. § 500.27(a). Likewise, under our Local Rule 27.2, we may certify questions of New York law to the New York Court of Appeals. Among the factors that guide our exercise of discretion to certify, or not, are: (1) whether the New York Court of Appeals has addressed the issue; (2) whether the question is "of importance to the state and may require value judgments and

public policy choices;" and (3) whether the certified question is "determinative of a claim before us." *Barenboim v. Starbucks Corp.*, 698 F.3d 104, 109 (2d Cir. 2012).

As set forth above, the New York Court of Appeals has not considered whether compliance with Education Law § 6530 and its subsections are licensing requirements for purposes of the Eligibility Regulation.

Three other considerations drive our decision to certify. First, answering the question presented would require us to decide an issue that is not only likely to be frequently litigated, but also one that comprises a vast portion of the dockets of arbitral tribunals and courts. Second, deciding the question would require us to make important policy judgments affecting a highly regulated industry— something "we are singularly unsuited to decide." *Mallela I*, 372 F.3d at 508. And third, the answer to the certified question would be determinative of this appeal.

*A. The Issue Is Frequently Recurring*

In general, no-fault disputes are frequently litigated. In 2007, a trial court in Queens County commented on the high-volume of no-fault litigation in New York's courts:

> In calendar year 2006 alone, the New York City Civil Court had approximately 100,000 new no-fault case filings, of which roughly 70,000 were filed in Queens County Civil Court. In Queens County Civil Court, on a typical 2007 court day, a trial judge may be assigned

35

two to seven no-fault trials and, on the summary judgment no-fault motion calendar, 100 or so motions may appear; considering a larger time frame of the last six months of 2006 in that same court and all types of no-fault motions, a total of almost 11,000 no-fault motions were resolved on the no-fault motion calendars, with more than 3,000 cases marked disposed, primarily by and before this judge.

*Complete Orthopedic Supplies, Inc. v. State Farm Ins. Co.*, 16 Misc.3d 996, 997 n.1 (N.Y. Civ. Ct. 2007).

To provide a more recent picture, we only need to look at the instant lawsuit. Before discovery closed in this case, GEICO sought a preliminary injunction to pause numerous pending proceedings and prevent the Mayzenberg Defendants from initiating new ones. *See Government Employees Insurance Co. v. Mayzenberg*, 2018 WL 6031156, at *11–12 (E.D.N.Y. Nov. 16, 2018). When GEICO sought a preliminary injunction, the Mayzenberg Defendants had already opened more than 500 lawsuits and 180 arbitration proceedings against GEICO for refusing to pay outstanding claims. *Id.* at *2. In a lengthy decision, the district court granted GEICO's motion in part and stayed all pending and future arbitration proceedings, but not any pending New York state litigation. *Id.* at *11. The district court also enjoined the Mayzenberg Defendants from opening any new state lawsuits. *Id.*

Preliminary injunctions recently issued from the Eastern District of New York further confirm that no-fault disputes involving patient referral schemes are

voluminous. *See, e.g., State Farm Mutual Automobile Insurance Company v. Metro Pain Specialists P.C.*, 2022 WL 1606523, at *6 (E.D.N.Y. May 20, 2022) (involving 1,569 pending arbitrations and 215 lawsuits), *aff'd in part, rev'd in part and remanded sub nom, State Farm Mutual Automobile Insurance Company v. Tri-Borough NY Medical Practice P.C.*, __ F.4th __, 2024 WL 4559452 (2d Cir. Oct. 24, 2024); *Government Employees Insurance Company v. Zilberman*, 2021 WL 1146086, at *1 (E.D.N.Y. Mar. 25, 2021) (120 pending arbitrations and 650 lawsuits); *Government Employees Insurance Company v. Cean*, 2019 WL 6253804, at *5 n.4 (E.D.N.Y. Nov. 22, 2019) (220 pending arbitrations).

Because no-fault litigation—including those implicating improper patient referral arrangements—consume a substantial portion of the dockets of arbitration tribunals and courts, we are loathe to decide this appeal without the benefit of the Court of Appeals' guidance, as any decision will have an immense impact on arbitral fora, state courts, and the federal courts.

### B. Important Policy Concerns Are Implicated

We are also mindful that our decision would require us to make policy judgments affecting a highly regulated industry. On one hand, the no-fault system was enacted to streamline litigation and claims processing. *Serio*, 100 N.Y.2d at 860. Expanding the Eligibility Regulation to encompass Education Law

§ 6530(18) (and potentially other forms of professional misconduct) could undermine that goal, since such a holding would expand the types of documentation insurers could seek to process no-fault claims and, consequently, increase the time it takes for insurers to process claims. *See Mallela I*, 372 F.3d at 507 ("[A]llowing insurers great latitude to inquire into potential flaws in a medical providers' license might also frustrate the goals of the speedy payment objective of the No-Fault Law.").

On the other hand, fraud is a serious concern in the no-fault insurance industry. Twenty years ago, when we certified our question in *Mallela I*, we noted that "between 1992 and 2001, reported incidents of automobile insurance fraud, the bulk of which occurred in the no-fault area, increased by 1700 percent . . . ." *Id.* (citing *Serio*, 100 N.Y.2d at 861). This dramatic uptick in instances of fraud "added an estimated $100 per year to the insurance costs of the average New York driver." *Id.* More recently, New York's Department of Financial Services reported that in 2023, it received 33,646 reports of suspected no-fault fraud. Adrienne A. Harris, Superintendent of New York State's Department of Financial Services, *Investigating and Combating Health Insurance Fraud*, at 2 (Mar. 15, 2024), https://www.dfs.ny.gov/system/files/documents/2024/03/2023-health-fraud-annual-report.pdf [https://perma.cc/99JE-XG6Q] (last accessed Nov. 8,

38

2024).  By far, suspected no-fault fraud is the most common form of fraud that the Department processes.  The 33,646 reports received by the Department represent 94% of all healthcare fraud reports received by the Department in 2023 and 75% of all fraud reports generally.  *Id.* at 4–5.  Given these concerns, a holding in GEICO's favor would further another policy goal of New York's no-fault system— "to provide substantial premium savings to New York motorists."  *Serio*, 100 N.Y.2d at 860.

As a federal court, we are ill-equipped to weigh these competing policy considerations to the extent they may impact the proper analysis of the Eligibility Regulation.  *See Mallela I*, 372 F.3d at 508 ("Where public policy considerations point in different directions, as they do here, certification is a particularly appropriate course of action.").

C. *The Answer to the Certified Question Bears Heavily on Remaining Issues*

Lastly, the answer to our certified question will be substantially determinative of this appeal.  If the district court incorrectly concluded that a violation of Education Law § 6530(18) disqualified Mingmen from receiving no-fault reimbursements, then it improperly granted summary judgment on all counts that the Mayzenberg Defendants challenge on appeal.  That is, if the Mayzenberg Defendants' reading of the Eligibility Regulation is correct, GEICO

39

was not entitled to declaratory judgment in its favor. It would also follow that neither Mayzenberg nor Mingmen had a duty to disclose that they participated in a patient referral scheme when they filed their no-fault claims, thereby defeating GEICO's allegation that they committed common law fraud and violated RICO.

Because resolution of this appeal hinges on the threshold question of whether the Eligibility Regulation applies to violations of Education Law § 6530(18), this consideration also weighs in favor of certification.

## CONCLUSION

Given the considerable stakes at issue and the risk that we may do harm to New York law, we conclude that the New York Court of Appeals should have the opportunity to decide the important and challenging question we have been called to answer. *See Loomis*, 91 F.4th at 581. Pursuant to our Local Rule 27.2 and 22 N.Y.C.R.R. § 500.27(a), we hereby **CERTIFY** the following question to the New York Court of Appeals:

> If an insurer determines a healthcare provider has improperly paid others for patient referrals, in violation of New York Education Law § 6530(18) and 8 N.Y.C.R.R. § 29.1(b)(3), can the insurer deny payment for no-fault benefits on the ground that the provider "fail[ed] to meet" a "necessary" State or local licensing requirement under 11 N.Y.C.R.R. § 65-3.16(a)(12)?

Consistent with our usual practice, we do not intend to limit the scope of the New York Court of Appeals' analysis through the formulation of our question, and we invite the Court of Appeals to expand upon or alter this question as it should deem appropriate. This panel will retain its jurisdiction.

It is therefore **ORDERED** that the Clerk of this Court transmit to the Clerk of the Court of Appeals of the State of New York a Certificate, as set forth below, together with a complete set of briefs and appendices, and the record filed in this Court by the parties.

**CERTIFICATE**

The foregoing is hereby certified to the Court of Appeals of the State of New York pursuant to Second Circuit Local Rule 27.2 and New York Codes, Rules, and Regulations Title 22, section 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit.