# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2024

(Argued: January 31, 2025 Decided: February 3, 2026)

Docket No. 24-191

GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY, GEICO CASUALTY COMPANY,

*Plaintiffs - Appellees*,

–v.–

BHARGAV PATEL, MD, PATEL MEDICAL CARE, P.C.,

*Defendants – Appellants*,

JOHN DOE DEFENDANTS 1 THROUGH 10,

*Defendants.*

B e f o r e :

CARNEY, PARK, and NARDINI, *Circuit Judges*.

In this suit brought under the Racketeering Influenced and Corrupt Organization Act ("RICO"), Plaintiffs the Government Employees Insurance Company ("GEICO") and three of its subsidiaries allege that Defendants Dr. Bhargav Patel ("Dr. Patel") and associated entities (collectively, "Defendants") participated in a scheme to defraud GEICO by exploiting New York's no-fault automobile insurance laws. Proceeding in the United States District Court for the Eastern District of New York (Matsumoto, *Judge*), GEICO filed a complaint seeking (1) a judgment in the amount of GEICO's payments to Defendants on fraudulent claims, and (2) a declaration that it need not pay any of Defendants' pending but as-yet unpaid claims for reimbursement.

Defendants then filed over 600 independent collection actions against GEICO in various New York state courts and arbitration tribunals, seeking judgments against GEICO totaling over $2 million based on benefits claims Defendants had submitted to GEICO and which GEICO had disputed or denied. In response, GEICO sought an order from the district court staying all of Defendants' pending state collections suits and enjoining Defendants from filing any new collection suits against it until the court ruled on GEICO's pending RICO claims. The district court granted the preliminary injunction, concluding that GEICO sufficiently demonstrated irreparable harm, serious questions going to the merits, and a balance of hardships tipping decidedly in its favor. *See Gov't Emps. Ins. Co. v. Patel*, No. 23-CV-2835, 2024 WL 84139 (E.D.N.Y. Jan. 8, 2024). The district court further determined that, under the "in aid of jurisdiction" exception to the Anti-Injunction Act, 28 U.S.C. § 2283, it had authority to temporarily enjoin the parallel state court and arbitration proceedings. *Id.* at *11–13. Defendants timely appealed.

Reviewing the district court's grant of a preliminary injunction for abuse of discretion, we identify none. The court did not clearly err in concluding that the parallel proceedings posed a risk of irreparable harm to GEICO: the potential of inconsistent judgments posed that risk, as did the possibility that the alleged overarching fraudulent scheme would be obscured by a requirement that GEICO's fraud defense be asserted piecemeal in the numerous individual state collection proceedings. Finally, in accordance with our recent decision in *State Farm Mutual Automobile Insurance Company v. Tri-Borough NY Medical Practice, P.C.*, 120 F.4th 59 (2d Cir. 2024), we conclude that the preliminary injunction did not violate the Anti-Injunction Act.

Judge PARK concurs in the judgment in a separate opinion.

AFFIRMED.

———————————

2

STEFAN BELINFANTI (Gary Tsirelman, *on the brief*), Gary Tsirelman, P.C., Brooklyn, NY, *for Defendants-Appellants*.

BARRY I. LEVY (Henry Mascia, Cheryl F. Korman, Michael A. Sirignano, *on the brief*), Rivkin Radler LLP, Uniondale, NY, *for Plaintiffs-Appellees*.

CARNEY, *Circuit Judge*:

In this suit brought under the Racketeering Influenced and Corrupt Organization Act ("RICO"), Plaintiff Government Employees Insurance Company ("GEICO") and three of its subsidiaries allege that Defendants Dr. Bhargav Patel ("Dr. Patel") and associated entities (collectively, "Defendants")[1] participated in a scheme to exploit New York's no-fault automobile insurance laws with the aim of defrauding GEICO and other New York auto insurers. GEICO claims that Defendants submitted to it millions of dollars in reimbursement claims for "medically unnecessary, experimental, excessive, illusory, and otherwise unreimbursable" treatment expenses—for treatments both provided and never provided—related to injuries suffered by insured individuals in motor vehicle accidents in New York. App'x at 11 (Compl. ¶ 1). GEICO seeks a judgment against Defendants in the amount of GEICO's payments on fraudulent claims and a declaration that it need not pay any of Defendants' pending reimbursement claims. GEICO also sought interim relief, as described below.

---

[1] The Complaint names the following entities as Defendants: Dr. Patel; Patel Medical Care, P.C., Dr. Patel's related professional corporation; and 10 "John Doe" defendants. Dr. Patel provides medical services through Patel Medical Care, P.C., which he owns, at four clinics located in the borough of Queens. Unless otherwise indicated, our reference to "Defendants" does not include the John Doe defendants, who are not appellants here.

GEICO filed this case in the United States District Court for the Eastern District of New York (Matsumoto, *Judge*). In response, the Defendants filed over 600 collection actions against GEICO in various New York state courts and arbitration tribunals, seeking judgments totaling more than $2 million based on benefits claims they submitted to GEICO, which GEICO either disputed or denied. GEICO then sought a preliminary injunction from the district court staying all of Defendants' collections proceedings and enjoining Defendants from filing any new collection actions against it until the district court ruled on the pending RICO claims.

The district court granted the preliminary injunction, concluding that GEICO sufficiently demonstrated serious questions going to the merits, irreparable harm, and a balance of hardships tipping decidedly in its favor. *See Gov't Emps. Ins. Co. v. Patel*, No. 23-CV-2835, 2024 WL 84139 (E.D.N.Y. Jan. 8, 2024). The district court's irreparable harm finding rested on GEICO's showing of the risk of inconsistent state court judgments against it and the likelihood of unnecessary and "potentially unrecoverable" expenditures of time and resources in the multiple state court proceedings. *Id.* at *6–8. The district court further determined that, under the "in aid of jurisdiction" exception to the Anti-Injunction Act, 28 U.S.C. § 2283, it had authority to enjoin the parallel state court and arbitration proceedings. *Id.* at *11–13. Defendants timely appealed.

Reviewing the district court's preliminary injunction order for abuse of discretion, we identify none. The court did not clearly err in concluding that the parallel proceedings posed a risk of irreparable harm to GEICO: the possibility of inconsistent judgments posed that risk, as did the possibility that Defendants' allegedly fraudulent scheme would be obscured if GEICO had to assert its defense piecemeal in the more than 600 individual state collection proceedings. Finally, in accordance with our recent decision in *State Farm Mutual Automobile Insurance Company v. Tri-Borough NY Medical*

4

*Practice, P.C.*, 120 F.4th 59 (2d Cir. 2024) ("*State Farm*"), we conclude that the stay order and temporary injunction did not violate the Anti-Injunction Act.

For these and the reasons further set forth below, we AFFIRM.

## BACKGROUND

### I.  New York's No-Fault Automobile Insurance Law

New York State's no-fault automobile insurance law and its implementing regulations create a system enabling insured individuals to avoid common-law tort litigation and efficiently recover expenses for their medical and other costs resulting from motor vehicle accidents. Two decades ago, shortly after the law was enacted, the New York Court of Appeals explained that the no-fault system "supplant[s] common-law tort actions for most victims of automobile accidents." *Med. Soc'y of N.Y. v. Serio*, 100 N.Y.2d 854, 860 (2003); *see also State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 502 (2d Cir. 2004) (same).

Under that system, insured individuals injured in a motor vehicle accident may claim and collect benefits of up to $50,000 from their insurers to cover "[b]asic economic loss." New York Insurance Law ("N.Y.S. Ins. Law") § 5102(a). Benefits available from insurers may include payments for medical and hospital bills, the costs of physical therapy, ambulance expenses, and the purchase of necessary prosthetics. *Id.* As the "no-fault" name implies, the insureds are entitled to such benefits regardless of their own culpability in an accident and without having to file suit against others involved in the accident. *See generally Aetna Health Plans v. Hanover Ins. Co.*, 36 N.Y.S. 3d 431, 434 (2016).

New York law now also permits insured individuals to assign their claims for no-fault benefits to eligible healthcare providers in compensation for healthcare services provided to them. N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 11, § 65-3.11(a). An assignee provider may seek payment for services rendered directly from an insurer

using standardized claim forms. *Id.* To be eligible to receive payment in this way, an assignee provider must meet all "applicable New York State or local licensing requirement[s]." *Id.* at § 65-3.16(a)(12).[2]

New York's no-fault regime imposes "strict, and brief, time periods for claim processing" on providers, insured individuals, and insurers. *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 409 (2d Cir. 2024). Insurers are allotted 30 days from submission to review, investigate, and verify an insured individual's claim for benefits. *Id.*; *see* N.Y. Ins. Law § 5106(a); 11 N.Y.C.R.R. § 65-3.8. An insurer that has failed either to pay or to deny a claim within the 30-day period is precluded from raising most defenses, including fraud and lack of medical necessity, in a subsequent action by its insured to collect on the claim. *Mayzenberg*, 121 F.4th at 409 ("[I]f the insurer fails to adhere to this 30-day deadline, it will be precluded from raising most defenses in any subsequent lawsuit.") (citing *Fair Price Med. Supply Corp. v. Travelers Indem. Co.*, 10 N.Y.3d 556, 563 (2008)); *see* N.Y. Ins. Law § 5106(a).

Once duly assigned an insured's benefits, a provider that has not received timely payment may sue the insurer either in state court or, under streamlined procedures, in

---

[2] In *Government Employees Insurance Company v. Mayzenberg*, 121 F.4th 404 (2d Cir. 2024), we certified to the New York Court of Appeals the question whether an insurer could deny payment for no-fault benefits to a healthcare provider under § 65-3.16(a)(12) if it determines that the provider improperly paid for patient referrals. *Id.* at 422. The New York Court of Appeals answered that question in the negative. *See Gov't Emps. Ins. Co. v. Mayzenberg*, --- N.E.3d ---, 2025 WL 3259882, at *3 (Nov. 24, 2025). An insurer, it said, is entitled to deny reimbursement of a provider's no-fault benefit claims "[o]nly after a State regulator has determined that [the] provider committed professional misconduct, and it has suspended, annulled, or revoked the[] [provider's] license" as a result. *Id.* While that decision may bear on the merits of this case, it has no impact on this appeal. At issue here is the district court's analysis of the preliminary injunction factors in staying Defendants' pending collections actions, not whether GEICO ultimately may deny Defendants' claims for reimbursement based on its determination that Defendants engaged in professional misconduct.

an arbitration proceeding. *See* N.Y. Ins. Law § 5106(b); 11 N.Y.C.R.R. § 65-4.1; *see, e.g.,* *Viviane Etienne Med. Care, P.C. v. Country-Wide Ins. Co.*, 25 N.Y.3d 498 (2015) (state court proceeding for recovery of benefits). To recover, the provider need only show that the "billing forms were mailed to and received by the relevant insurance carrier," and that it and did not receive payment within the 30-day period. *Viviane Etienne Med. Care, P.C.*, 25 N.Y.3d at 506–07. An insurer that pays a claim for benefits and later discovers fraud by an assignee, however, may sue the assignee for damages. *See, e.g., Mayzenberg*, 121 F.4th at 412-13. When an insurer has received but not yet paid a claim, it may also seek a judicial declaration that it is not liable for the unpaid claim. *See id.*

The no-fault system is aimed at providing insured individuals efficient and predictable recovery for economic loss resulting from motor vehicle accidents. *See id*. at 409; *Med. Soc'y of New York*, 100 N.Y.2d at 860. The "'strict, and brief, time periods for claim processing'" are intended to "ensure prompt compensation for individuals injured in motor vehicle accidents without regard to fault" and "reduce litigation burdens on the courts." *Mayzenberg*, 121 F.4th at 409 (quoting *Mallela*, 372 F.3d at 503). The no-fault arbitration procedure, in particular, is "an expedited, simplified affair meant to work as quickly and efficiently as possible." *Allstate Ins. Co. v. Mun*, 751 F.3d 94, 99 (2d Cir. 2014). On the other hand, as we have explained, the no-fault system's expedited nature means that it cannot readily accommodate "[c]omplex fraud and RICO claims, maturing years after the initial claimants were fully reimbursed." *Id.*

## II.     Factual Background[3]

From August 2019 to April 2023, Defendants submitted approximately $3.4 million in no-fault benefits claims to GEICO. According to GEICO, however, these

---

[3] The factual description provided here is drawn from the allegations of GEICO's complaint, the materials attached to its motion for a stay and injunctive relief, and those attached to

included claims for treatments that were "medically unnecessary, experimental, excessive, illusory, and otherwise unreimbursable." App'x at 10–11 (¶ 1). These claims, GEICO urges, were the result of an elaborate fraudulent scheme designed to maximize Defendants' profits rather than provide any benefit to the patients Defendants purported to have treated.

GEICO describes the purportedly fraudulent scheme in great detail in its complaint and motion-related papers. It alleges that Defendants' process to generate a fraudulent claim rested on their "patient" procurement practices.[4] According to GEICO, Dr. Patel and his associated providers made no effort to cultivate legitimate relationships with patients or to develop a real medical practice. Instead, third-party "broker[s]" (these are the "John Doe" defendants) referred injured individuals to one of Defendants' four clinics and then facilitated Dr. Patel's access to those individuals. App'x at 24 (¶ 48). In exchange, Defendants compensated the third parties based on the volume of patients they referred, using kickback arrangements that, in GEICO's view, violated New York law.

Upon receiving a referral, Defendants would conduct an initial consultation and examination of the patient at one of their clinics, GEICO relates. These consultations— which GEICO says rarely lasted longer than 30 minutes—served as a "gateway" for

---

Defendants' opposition to those motions. Defendants fault the district court for relying on evidence that would not be admissible at trial on GEICO's claims. We have observed, however, that a motion for preliminary injunction request is often decided in a "less formal" procedural setting than a trial, and that otherwise-inadmissible evidence may be considered at that early stage. *Mullins v. City of New York*, 626 F.3d 47, 51–52 (2d Cir. 2010). We therefore find unpersuasive Defendants' many arguments grounded in their assertions of inadmissibility.

[4] GEICO alleges both that Defendants billed for services they did not render and that they rendered treatment that was unnecessary. For simplicity, we refer to individuals for whom Defendants submitted claims as "patients," whether or not Defendants actually provided any treatment to them.

treatments that were "medically unnecessary, excessive, experimental, and . . . illusory," as we recounted above. App'x at 30 (¶ 76). After the consultations, virtually all of the referred patients would be subjected to a "predetermined, fraudulent" treatment schedule and to the clinic's billing protocol without regard for their actual medical needs. *Id.* (¶ 77).

The billing protocol used by the clinics was designed to enable Defendants to "generate and falsely justify the maximum amount of fraudulent no-fault billing" for each patient, as GEICO tells it. *Id.* at 29 (¶ 71). The result was that Defendants provided medically unnecessary services, including some "experimental and investigational" treatments, for which they subsequently submitted benefit claims to insurers. *Id.* at 19-20 (¶ 39). In addition, GEICO says, Defendants sought payment for services never provided: they submitted claim forms falsely identifying Dr. Patel as the treating provider, even though independent contractors—including, at times, unlicensed individuals—provided the services billed for. GEICO claims that Defendants also provided claim forms bearing forged patient signatures for services not rendered at all.

### III. This Action

On April 17, 2023, GEICO sued Defendants in the District Court for the Eastern District of New York, asserting claims under RICO and under New York law on theories of common-law fraud and unjust enrichment. GEICO sought to recover at least the $711,000 that it had paid to Defendants in benefits claims. It also sought a judgment declaring that Defendants were not entitled to payment of $2.2 million in pending and unpaid claims submitted to GEICO since 2019.

Meanwhile, from April through November 2023, Defendants filed approximately 605 individual actions against GEICO seeking payment on claims GEICO had disputed or denied from 2019 through 2023. These actions, seeking sums totaling over $2.675

9

million, included approximately 600 lawsuits filed in New York state court and two arbitration proceedings with the American Arbitration Association.[5] GEICO claims that Defendants, deciding not to counterclaim in GEICO's federal action or to file one consolidated state-court collection action, instead chose to file these hundreds of individual actions to prevent the district court from fully adjudicating its claims against them and to obscure their ongoing fraud.

GEICO sought injunctive relief from the district court. It asked for an order temporarily enjoining Defendants from attempting to collect any additional compensation from GEICO under the no-fault system and staying all of Defendants' pending state collections actions. Defendants opposed, arguing that GEICO had failed to demonstrate irreparable harm, that the balance of hardships weighed in their favor, and that an injunction was barred by the Anti-Injunction Act, 28 U.S.C. § 2283. The district court granted the motion, stayed the pending collections proceedings, and enjoined Defendants from filing any additional collections actions against GEICO until it had issued a decision resolving GEICO's underlying action. Defendants timely appealed.

When GEICO and Defendants filed their briefs in this action, we had previously addressed the availability of injunctive relief and of a related stay of a parallel no-fault state court proceeding in only one decision, a non-precedential summary order. *See Allstate Ins. Co. v. Harvey Fam. Chiropractic*, 677 F. App'x 716 (2d Cir. 2017). In *Harvey*, we

---

[5] The parties dispute whether any of the no-fault claims were filed as arbitrations rather than state-court collections actions. The district court decided to "rel[y] on the [GEICO employee] declaration and assume[], without deciding, that there [were] active arbitrations" that should be stayed. *Patel*, 2024 WL 84139, at *5 n.1. In light of the evidence submitted by GEICO to support its claim, including an employee's declaration under oath, we find no merit in Defendants' argument that the district court abused its discretion in crediting GEICO's characterization over that offered by Defendants.

affirmed the district court's decision to deny the requested preliminary injunction, citing an absence of record evidence that the plaintiffs could not be fully compensated through a later award of money damages. *See id.* at 718.

After *Harvey*, however, and while the appeal in this case was pending, we decided *State Farm*. There, we affirmed a district court's grant of a preliminary injunction staying hundreds of parallel no-fault state-court and arbitration proceedings in a context presenting many parallels to GEICO's case, as we will explain. The parties have submitted letter briefs addressing the effect of *State Farm* on this appeal.

## DISCUSSION

### I. Standard of Review

We review both the district court's grant of a preliminary injunction and its stay of parallel state court proceedings for abuse of discretion. *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010). A district court "'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001).

### II. Analysis

#### A. Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *State Farm*, 120 F.4th at 79 (quoting *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005)). To meet that burden, the movant must demonstrate "(1)

irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). Under the two-part "serious questions" standard, the "overall burden is no lighter than the one the [movant] bears under the 'likelihood of success' standard," for the movant must "demonstrate both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *State Farm*, 120 F.4th at 79–80 (alterations omitted) (quoting Citigroup *Glob. Mkts., Inc.*, 598 F.3d at 35). Our standard analysis begins, however, with a focus on a movant's claim of irreparable harm, which, as "the single most important prerequisite for the issuance of a preliminary injunction," must be satisfied before the remaining requirements need be considered. *Id.* at 80 (quoting *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). We do so here.

1. *Irreparable harm*

To demonstrate that the district court's failure to provide the requested relief will cause it irreparable harm, the movant must show an "injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 106 (2d Cir. 2025) (quoting *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020)). The injury must also be a "continuing" one. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). A threat of irreparable harm arises "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *State Farm*, 120 F.4th at 80 (quoting *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999)). So to establish irreparable harm, the movant "must show that

12

there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Id.* (internal citation and quotation marks omitted).

The district court concluded that GEICO made this showing. It determined that, if Defendants were "permitted to prosecute the ongoing collection proceedings," GEICO would "face[] imminent and non-speculative risks of inconsistent judgments and unnecessary, and potentially unrecoverable, expenditures of time and resources on arbitrations and state lawsuits that may be resolved by the instant, pending declaratory judgment action." *Patel*, 2024 WL 84139, at *8. Moreover, the court explained, permitting the collections actions to proceed would "nullify [GEICO's] efforts to prove fraud at a systematic level . . . and deprive [GEICO] of an avenue towards complete relief in *any* court." *Id.* at *7 (quoting *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F.Supp.3d 215, 232 (E.D.N.Y. 2018)) (emphasis in original).

Defendants challenge this conclusion, arguing that neither the waste of time and resources nor the risk of inconsistent judgments—either among state courts or between state courts and the federal district court—would irreparably harm GEICO. Any expenditure of time and resources, they say, could later be remedied by money damages, and the risk of inconsistent judgments is "speculative and non-imminent." Appellants' Br. at 42. They argue, too, that the state courts are "well-suited" to adjudicate GEICO's fraud defenses, *id.* at 34, and so the cited risk that Defendants could obscure their overarching fraudulent scheme through the state court actions, as GEICO contends, is nonexistent.

We identify no error in the district court's assessment that GEICO has made a sufficient showing of irreparable harm. As the district court correctly reasoned, the pendency of hundreds of collections actions poses a clear risk of "inconsistent arbitration decisions and judicial judgments," simply by their numerosity. *Patel*, 2024

13

WL 84139, at * 7. In addition, if not stayed, the individualized nature of the cascading collections actions creates a risk that Defendants' overarching fraudulent scheme, as alleged by GEICO, will be unrecognized by any individual state court or arbitrator and that the district court will be precluded from providing complete relief to GEICO if GEICO proves to be so entitled.

To begin with, expedited no-fault arbitrations, as GEICO describes, "generally contemplate no substantive discovery" in advance of an arbitral hearing, nor do they typically permit "any meaningful examination or cross-examination" during the hearing. Suppl. App'x at 42 (citing 11 N.Y.C.R.R. § 65-4.1). Indeed, in expedited arbitrations, claims are often "heard and resolved in minutes." *Id.* Even in state court, where GEICO would have a "greater ability to conduct discovery," the "limited nature" of each individual case, involving only one billed service, would severely undermine GEICO's capacity to prove complex fraud through those proceedings. *Id.* In other words, GEICO plausibly alleges, as did the plaintiff insurer in *State Farm*, that the collections actions are fragmented proceedings that "involve single claims for a single date of service, so that these fragmented proceedings end up obscuring what [GEICO] contends is an elaborate and complex fraudulent scheme." 120 F.4th at 80.

In *State Farm*, we explained that the defendants' myriad claims for benefits as assignee may well look different when viewed in the aggregate than when viewed in hundreds of individual proceedings, creating a risk that "the arbitrations and state-court proceedings [would] . . . help to insulate the alleged fraud from detection." *Id.* at 81. So too here. One reviewing arbitrator or state court judge, based on an isolated factual record of one claim for one patient, might conclude that a certain treatment was medically necessary for that patient. But the district court here, reviewing aggregated claims, would be able to identify patterns in those claims, and would be better positioned to reach a conclusion (if justified) that Defendants in fact adhered to

14

predetermined treatment protocols whether or not necessary in individual cases, as GEICO alleges. The district court would also be better positioned, by comparing claims submitted by all four of the clinics, to discern whether Dr. Patel could possibly have provided all the treatments for which claims were submitted in his name and so to conclude that certain claims were either for services provided by third parties or for services not provided at all, as GEICO contends. Such a conclusion would be "exceedingly difficult to establish in a proceeding on a single claim." *Id.* at 80-81. Without a stay, then, GEICO faces a real risk that "the global and intertwined nature of the fraud" it alleges could be "effectively obscured." *Id.* at 80.

Contrary to Defendants' contention, this risk is far from "hypothetical" or "speculative." Appellants' Br. at 42–43. As we have explained, GEICO has made a sufficient showing, based on the nature of the state-court and arbitration proceedings initiated by Defendants, that it might be unable to successfully assert its global fraud defense in those proceedings. It need do no more. *See State Farm*, 120 F.4th at 80–81. Further, the harm alleged is also imminent and continuing, as the district court correctly explained, because "without injunctive relief . . . Defendants may continue to commence arbitrations before the AAA and state lawsuits for outstanding claims." *Patel*, 2024 WL 84139, at *7; *see also State Farm*, 120 F.4th at 81 (finding a harm imminent and continuing because, "[w]ithout the preliminary injunction," defendants could "continue bringing new actions to recover the remaining unpaid claims for No-Fault benefits").

Nor are we persuaded by Defendants' assertion that any harm arising to GEICO from the collections actions would be compensable by money damages. It is true, as Defendants argue, that generally "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). But GEICO's incurring litigation expense is not the risk we identify; the risk, as we have explained, is that Defendants could

15

exploit the individualized nature of the collections actions to obscure their fraudulent scheme and prevent the district court from providing complete relief to GEICO.[6]

As we concluded in *State Farm*, moreover, this risk is heightened by "the potential preclusive effect of the state-court proceedings and arbitrations." 120 F.4th at 81. Absent a stay, it is virtually certain that some, if not all, of the expedited collections actions would conclude before the action in the district court. Both state-court judgments and arbitral determinations can have preclusive effect in federal courts. *See id.* (citing *Whitfield v. City of New York*, 96 F.4th 504, 522 (2d Cir. 2024) and *Jacobson v. Fireman's Fund Ins. Co.*, 111 F.3d 261, 267–68 (2d Cir. 1997)). Indeed, "the No-Fault Act specifically provides that '[a]n award by an arbitrator shall be binding.'" *Id.* at 82 (quoting N.Y. Ins. Law § 5106(c)).

In light of this rule, Defendants could obtain factual determinations unfavorable to GEICO in individualized collections proceedings with a limited record and then use the preclusive effect of those determinations against GEICO in other proceedings, both in state and federal court. This reality could bar GEICO from subsequently recovering on certain claims in its federal court action, even if it were to prevail in that action. In addition to obscuring the extent of Defendants' allegedly fraudulent scheme, then, the collections actions might also prevent the district court from providing complete relief to GEICO if so entitled. *See Patel*, 2024 WL 84139, at *7 (highlighting the risk that the

---

[6] What's more, we have found that monetary loss accompanied by other intangible harms may constitute irreparable harm. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (holding that monetary damages combined with loss of reputation, good will, and business opportunities amounted to irreparable harm); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (same for monetary damages combined with loss of relationship with client). Accordingly, that *one* of the harms GEICO may suffer absent a stay is monetary in nature does not undermine the district court's ruling that GEICO has shown a risk of irreparable harm.

collections actions could "deprive GEICO of an avenue towards complete relief in *any* court") (emphasis in original and alterations adopted).

Defendants assert that the district court suggested that it "is not bound by the state court judgments," and argue on this basis that the potential preclusive effects of the collections actions are minimal. Appellant's Reply Br. at 5 (emphasis removed). But we do not read the court to have suggested that it would decline to credit the outcomes rendered in state court proceedings; rather, we read it to have suggested that the stay would avoid the possibility of contradictory conclusions in the first place, since the state-court and arbitration proceedings might become unnecessary if GEICO's claims were resolved in the federal action. Indeed, we read the district court's decision as expressly invoking preclusion concerns as one of the bases for the stay that it entered. *See Patel*, 2024 WL 84139, at *7 (reasoning that parallel state court proceedings could "subject GEICO to independent and contradictory conclusions that ultimately may be rendered ineffective by this Court") (internal citation and quotation marks omitted).[7]

In any event, federal law mandates that federal courts "give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Whitfield*, 96 F.4th at 522 (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *see* 28 U.S.C. § 1738. And, as Defendants point out, "[c]ollateral estoppel is so [e]ngrained in [the] New York judicial system that even a prior no-fault arbitration award on a decided issue will have collateral estoppel effect on subsequent court actions between the same parties."

---

[7] We also reject any suggestion by Defendants that the district court's decision creates federalism concerns. The collections actions GEICO seeks to stay were not initiated until *after* the federal court action began. On these facts, it is clear that GEICO did not come to the federal system with the goal of upsetting the now-stayed state court proceedings. *Cf. Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 283 (1970).

Appellants' Br. at 33. We have no difficulty in concluding, then, that the collections proceedings *might* have preclusive effect in the federal action. This possibility, as we explained in *State Farm*, is enough for GEICO to have sufficiently demonstrated a risk of irreparable harm to support its claim for relief. *See* 120 F.4th at 81 ("[I]t is premature at this point to attempt to ascertain the definitive preclusive effect of such proceedings because our task at this juncture is solely to determine whether there is a sufficient showing of a risk of irreparable harm absent an injunction. We believe there is.").

Defendants, urging a contrary conclusion, suggest that GEICO had an alternative route to avoiding the risks posed by their numerous collection actions: seeking consolidation of those actions in state court. But the decision to consolidate the state court collections cases is for the state courts to make. *See Berman v. Greenwood Vill. Cmty. Dev., Inc.*, 156 A.D.2d 326, 326 (2d Dep't 1989) ("It is well established that the power to order consolidation rests in the sound discretion of the court[.]"). Moreover, in view of the fact-specific nature of the claims, case-management challenges, and resource limitations, "consolidation is highly disfavored by courts in no-fault insurance cases." *Urban Radiology, P.C. v. GEICO*, 28 Misc. 3d 1230(A), at *2 (Kings Cnty. 2010); *see, e.g., Radiology Res. Network, P.C. v. Fireman's Fund Ins. Co.*, 12 A.D.3d 185, 186 (1st Dep't 2004) (denying consolidation of 68 no-fault benefits claims because "to try all 68 claims together would be unwieldy and would create a substantial risk of confusing the trier of fact"); *Poole v. Allstate Ins. Co.*, 20 A.D.3d 518, 519 (2d Dep't 2005) (stating that consolidating 47 no-fault benefits claims "would prove unwieldy and confuse the trier of fact"). Generally, "no-fault benefit claims may not be consolidated unless the facts and circumstances arise from a common accident." *Urban Radiology*, 28 Misc. 3d 1230(A), at *2. We thus cannot be confident that an attempt to consolidate over 600

proceedings would succeed. We see no need for GEICO to be forced to venture down this path.[8]

Finally, we reject, too, Defendants' argument that the district court abused its discretion in entering a stay on the ground that the district court cannot offer "full adjudication" of their own claims for reimbursement. Appellant's Br. 25–26. The district court, Defendants say, "ignore[d]" that it would lack jurisdiction over their claims and be without power to issue monetary judgment in their favor if it determined they were so entitled. *Id.* at 26. Defendants ignore, however, that the district court is likely authorized by 28 U.S.C. § 1367(a) to exercise supplemental jurisdiction over their claims, which may be seen as forming part of the same "case or controversy" as GEICO's claims. So Defendants' choice to file their benefits claims in state court rather than seeking to assert them as counterclaims in this action needlessly generates the logistical difficulty they complain of. Moreover, if Defendants' claims against GEICO have merit, they will ultimately be able to recover fully notwithstanding the stay. Thus, entering a stay would mean at worst that any financial recovery to which Defendants are entitled may be delayed, not defeated.[9]

---

[8] Defendants also advance a related claim: consolidation is unnecessary for an insurer to obtain broad discovery, they argue, since New York courts may permit extensive discovery in fraud cases. Appellant's Br. at 40. This argument suffers from the same flaw: decisions regarding the scope of discovery are discretionary in New York courts. *See Lexington Acupuncture, P.C. v. Gen. Assur. Co.*, 35 Misc. 3d 42, 43–44 (2d Dep't 2012) (noting discretionary nature of decision). GEICO need not rely on discretionary rulings to mitigate the serious risks posed by the collections actions.

[9] Defendants also overlook the clear risk of harm to GEICO if GEICO were to succeed in proving in district court that Defendants are in fact ineligible to receive payment on their claims. As GEICO points out, the monetary relief it seeks in the district court is for payments it has *already* made on Defendants' claims; it does not include payments on the claims underlying the pending collections actions. If forced to make payments on those still-pending claims while the federal action is ongoing, GEICO risks an inability (should it prevail) to recover those

We decide, then, that GEICO "sufficiently alleges that the massive fraudulent scheme here becomes apparent only when the claims are analyzed altogether." *State Farm*, 120 F.4th at 80. The risks created by disaggregating the scheme into individual actions—both financial and of concealment—amount to allowing irreparable harm to GEICO if the actions are permitted to proceed. We therefore discern no error of fact or of law in the district court's conclusion that GEICO satisfied the irreparable harm requirement.

### 2. *"Serious questions going to the merits"*

In arguing that GEICO did not meet the serious-questions standard, Defendants' sole contention is that GEICO failed to sufficiently support its factual allegations regarding their fraudulent scheme. Since Defendants point to nothing in the district court record demonstrating that they advanced any challenge to the adequacy of GEICO's complaint and exhibits in support of its motion for a preliminary injunction, they have forfeited this argument. *See Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 68 (2d Cir. 2010) ("An argument raised for the first time on appeal is typically forfeited.").

Even if the argument were not forfeited, it has no merit. The serious-questions standard is designed to provide "flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35. For this reason, "courts applying the 'serious questions' standard have the discretion to rely on the pleadings and accompanying affidavits . . . to resolve preliminary injunction motions." *State Farm*, 120 F.4th at 83. The district court did not err in concluding that GEICO's allegations and evidentiary submissions satisfied this flexible standard.

---

additional payments. Thus, as GEICO persuasively describes, it could "be left with a hollow declaratory judgment" from the district court after all the pending collections actions have concluded. Appellees' Br. at 40.

Again, our decision in *State Farm* all but resolves this question, for the schemes alleged and evidence provided are substantially identical. As did the plaintiff insurer in *State Farm*, GEICO sufficiently alleges a complex fraudulent scheme and provides details and documentary evidence to support its allegations. GEICO's complaint describes with specificity the "history and operation" of Defendants' four clinics. *See State Farm,* 120 F.4th at 84. It outlines the "predetermined treatment protocols utilized at the gatekeeper clinics and unnecessary medical care further provided to patients, including the precise medical procedures, devices, and treatments rendered." *Id.* It explains how Defendants worked with unauthorized third parties and entered into financial relationships in exchange for patient referrals, all allegedly in violation of state law. To support its allegations and request for interim relief, GEICO "attached an affidavit and exhibits . . . detailing the number of pending arbitrations and state-court proceedings that Defendants had filed." *Id.* It identifies specific billing codes used by Defendants to artificially inflate the amount they could recover and provides documents demonstrating claims submitted under those billing codes. It also describes testimony given by Dr. Patel in deposition that raised serious questions about the legitimacy of Defendants' business operations. On these facts, we have no trouble concluding that GEICO satisfied the "flexible approach" of the serious-questions standard. *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 37.

### 3. *Balance of hardships*

As we have explained, when a preliminary injunction is sought based on a "serious question[] going to the merits" of a case (rather than likelihood of success on the merits), the movant must further demonstrate that "the balance of hardships tips decidedly in its favor." *State Farm*, 120 F.4th at 83–84. This factor requires the district court to "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Yang v. Kosinski*, 960 F.3d 119,

21

135 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). The harms to be considered are those that "(a) occur[] to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *State Farm*, 120 F.4th at 85.

The district court determined that, if the expedited state court collections actions were to be stayed, Defendants would at the worst suffer from delayed recovery of payment. *Patel*, 2024 WL 84139, at *10. But if the federal court action is meritorious and the state court actions not stayed, the court reasoned, GEICO would suffer the irreparable harm described above. *Id.* ("[I]f GEICO prevails, money damages will be inadequate to remedy the Plaintiffs' time and losses, and because of the risk of inconsistent outcomes."). Weighing these relative hardships, the court concluded that the balance tipped decidedly in GEICO's favor.

Defendants urge that in this the district court erred: GEICO has not yet made any payment for the disputed claims, they point out, whereas they, the medical care providers, have already incurred expenses and now simply seek "to recoup [their] losses." Appellants' Br. at 44. We do not find this argument persuasive. While it may be true that Defendants would face some hardship from the grant of a stay, we have already explained that the only harm they could suffer would be financial: a delay in securing reimbursement for the benefits to which they assert they are entitled. Defendants do not seriously claim that they would not eventually receive payment on their meritorious claims. Any harm Defendants incur, then, could "be remedied by monetary damages should they later prevail." *State Farm*, 120 F.4th at 85.

Nor do we agree with Defendants that, in weighing the competing hardships, the district court did not adequately consider "the danger [to the Defendants] of 'policy exhaustion,'" Appellants' Br. at 44—that is, the possibility that Defendants could be harmed if the coverage provided by relevant insurance policies became exhausted

22

during the pendency of the suit. Because the no-fault system caps payable no-fault benefits at $50,000 per claimant, Defendants hypothesize, individual claimants insured by GEICO could top out, preventing Defendants from later collecting on some subset of claims after the stay is lifted. As the district court observed, however, Defendants make no effort to show that any specific policies are at risk of exhaustion or specific claims at risk of becoming uncollectable. *Patel*, 2024 WL 84139, at *10 ("Defendants do not identify any claims that might actually be rendered uncollectable, or any reason why [they] could not collect on their claims from other payors should a hypothetical policy be exhausted."). We therefore find no merit in their argument that the district court's analysis was flawed.

### 4. *Public interest*

Finally, turning to the last factor, "whether the preliminary injunction is in the public interest" in view of the consequences of granting injunctive relief, *State Farm*, 120 F.4th at 85, we conclude that it is.

The no-fault insurance system, as we have described, is designed "to reduce the burden on the courts and to provide substantial premium savings to New York motorists." *Mun*, 751 F.3d at 99. Fraud on the no-fault system "serves to undermine and damage the integrity of the . . . system, which was created as a social reparations system for the benefit of consumers." *Id.* at 100. Safeguarding the integrity of that system by "detecting and preventing insurance fraud" is therefore strongly in the public interest. *State Farm*, 120 F.4th at 85.

Insurers, by virtue of their central role in the system, are "uniquely positioned to combat the depletion of public resources caused by fraudulent claims for No-Fault benefits." *Id.* Accordingly, the public interest in detecting and preventing insurance fraud is undermined when insurers, alleging fraud, must defend "thousands of

23

arbitrations and state-court proceedings for reimbursement of individual claims . . . into which complex fraud and RICO claims cannot be shoehorned." *Id.* at 85-86 (internal citation and quotation marks omitted and alterations adopted). Preserving GEICO's "ability to prove its allegations of a complex fraudulent scheme involving insurance benefits," which would be significantly impaired absent a stay of state court proceedings, is thus indisputably in the public interest. *Id.* at 86.

The methodical fraudulent scheme alleged here, if proven, would also have worked many ancillary violations of state law, including the provision of medical treatment by unlicensed technicians and the payment of kickbacks for referrals—all actions in conflict with the public interest. *See, e.g.,* N.Y. Educ. Law § 6530(11) (prohibiting unlicensed persons from performing activities requiring a license), 6530(18) (prohibiting kickbacks for referrals). Furthermore, the scheme as alleged by GEICO involves deliberately bogging down scarce judicial resources in service of the fraud. Preventing those harms, too, is in the public interest.

\* \* \*

For these reasons, we identify no error of fact or of law in the district court's conclusion that GEICO was entitled to a preliminary injunction staying the pending state-court and arbitration collections proceedings brought by Defendants.

## B. The Anti-Injunction Act

Federal courts have long been authorized by statute to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This, the All Writs Act, passed in 1789, empowers federal courts to enjoin state-court proceedings when doing so is necessary "to prevent third parties from thwarting [a] court's ability to reach and resolve the

24

merits of the federal suit before it." *In re Baldwin-United Corp.*, 770 F.2d 328, 338–39 (2d Cir. 1985).

The broad authority conferred by the All Writs Act is limited, however, by another venerable statute: the Anti-Injunction Act. 28 U.S.C. § 2283. First enacted in 1793, the Anti-Injunction Act reflects a "core message . . . of respect for state courts." *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011). It "broadly commands that those tribunals shall remain free from interference by federal courts." *Id.* (internal citation and quotation marks omitted). The Anti-Injunction Act thus proscribes federal court interference with state-court proceedings. Its proscription is subject, however, to three narrow exceptions: where such an injunction is: (1) "expressly authorized by Act of Congress"; (2) "necessary in aid of its jurisdiction"; or (3) necessary "to protect or effectuate its judgments." 28 U.S.C. § 2283. A district court's application of the Anti-Injunction Act presents a question of law that we review *de novo*. *State Farm*, 120 F.4th at 92.

The district court here concluded that the Anti-Injunction Act's "in-aid-of-jurisdiction" exception permitted it to enter a stay of the pending state court collections actions. *Patel*, 2024 WL 84139, at *12–13.[10] It reasoned that, in view of the "over 600 pending state actions, all of which are connected to the federal action" and might "conflict with the declaratory judgment," new state court judgments in actions brought by Defendants could not "'peaceably coexist'" with the district court's judgment. *Id.* at *13 (quoting *United States v. Schurkman*, 728 F.3d 129, 139 (2d Cir. 2013)).

Defendants take issue with the court's reliance on this exception, whose use it characterizes as "very rare" and available only in "extraordinary circumstances" that it

---

[10] Defendants do not contend that the Anti-Injunction Act applies either to the pending arbitration proceedings or to any as-yet unfiled state court collection cases.

claims are not present here. Appellants' Br. at 48–49. GEICO, on the other hand, contends not only that the in-aid-of-jurisdiction exception is satisfied, but also that the district court's action is permissible under the exception for matters "expressly authorized by Act of Congress," arguing that RICO "expressly authorizes" federal courts to stay certain state court proceedings, such as those at issue here. Appellees' Br. at 58–59; *see* 18 U.S.C. § 1964(a) ("The district courts . . . shall have jurisdiction to prevent and restrain violations . . . of this chapter by issuing appropriate orders[.]").

In light of our decision in *State Farm*, we need not address further the applicability of the Anti-Injunction Act's in-aid-of-jurisdiction exception. In *State Farm*, we held that in a parallel case involving "hundreds of purportedly meritless state-court proceedings that help further a RICO violation," 120 F.4th at 99, a preliminary injunction of those proceedings is authorized by RICO and so "falls within the 'expressly-authorized' exception" to the Anti-Injunction Act, *id.* at 98. For purposes of Anti-Injunction Act analysis, we perceive no material distinction between the facts and claims presented in *State Farm* and those found here, and Defendants identify none. Accordingly, *State Farm* dictates our response to Defendants' argument. The district court did not violate the Anti-Injunction Act by entering the injunctive relief requested by GEICO.

## CONCLUSION

We have considered Defendants' remaining arguments and conclude that they are without merit. Accordingly, we **AFFIRM** the order of the district court.

PARK, *Circuit Judge*, concurring:

I agree with the majority that this case is controlled by *State Farm Mutual Automobile Insurance Co. v. Tri-Borough NY Medical Practice P.C.*, 120 F.4th 59 (2d Cir. 2024). But that decision misinterpreted the Anti-Injunction Act ("AIA") and should be applied narrowly. Federal courts "may not grant an injunction to stay proceedings in a State court except as *expressly authorized* by Act of Congress." 28 U.S.C. § 2283 (emphasis added). Under this narrow exception, a statute may allow a federal court to enjoin a state-court proceeding that "in and of itself" violates the statute. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 645 (1977) (Blackmun, J., concurring). But *State Farm* did not conclude that the state-court suits at issue were themselves predicate acts under RICO, so the AIA should have barred the federal court from enjoining them. *See* 120 F.4th at 98 n.14.

## I

### A

"[F]rom the beginning we have had in this country two essentially separate legal systems"—state and federal courts. *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 286 (1970). For adjudicating federal claims, the "rank and authority of [those] courts are equal." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 235 (1922). In fact, lower federal courts did not have general jurisdiction over federal questions until 1875. So for much of our country's history, we "relied on the adequacy of the state judicial systems to enforce federal rights." *Amalgamated Clothing Workers of Am. v. Richman Bros.*, 348 U.S. 511, 518 (1955).

The AIA "is a necessary concomitant of [this] dual system of federal and state courts." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988). Enacted in 1793, it generally prohibits federal injunctions of pending state-court cases, including when state proceedings "interfere with a protected federal right." *Atl. Coast Line*, 398 U.S. at 294. Otherwise, "[l]itigants who foresaw the possibility of more favorable treatment in [federal court] would predictably hasten" to enjoin parallel state proceedings. *Id.* at 286. Such "intrusion of federal authority into the orderly functioning of a state's judicial process," *Toucey v. N.Y. Life Ins. Co.*, 314 U.S. 118, 135 (1941), would be inconsistent with the "well-established rule" that state and federal courts "are of equal rank," *Kline*, 260 U.S. at 235.

**B**

There is an exception to the AIA's broad prohibition for injunctions that are "expressly authorized" by Congress. 28 U.S.C. § 2283. For example, the removal statute provides that after a case is removed, "the State court shall proceed no further." *Id.* § 1446(d). And 42 U.S.C. § 1983 prohibits unlawful official conduct, including the use of state-court proceedings to enforce unconstitutional state laws. *See Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

In these instances, the federal statute can "be given its intended scope only by the stay of a state court proceeding." *Id.* at 238. This is a "narrow" exception. *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (quotation marks omitted). Over the 230-year history of the AIA, the Supreme Court has held that only eight statutes provide an express authorization. Each statute prohibited the continuation of state

proceedings—either on its face or because the state proceeding itself violated federal law.[1]

But there is no express authorization when a statute does not explicitly authorize injunctions and the state-court suit does not violate that statute. That was the Court's conclusion in *Amalgamated Clothing Workers*, where a union asked a federal court to enjoin a state-court labor dispute because the Taft-Hartley Act removed state-court jurisdiction over the dispute. *See* 348 U.S. at 513. The Taft-Harley Act did not explicitly authorize an injunction and the "employer's use of the judicial process of the State [did] not amount to an unfair labor practice," so no injunction could be issued. *Id.* at 516-17. The union's argument that a state-court *decision* would "dislocate[] the federal scheme" did not change that result. *Id.* at 517.

---

[1] The federal removal statutes, the Limitation of Liability Act, the Interpleader Act, the Frazier-Lemke Farm-Mortgage Act, and the Federal Habeas Corpus Act all explicitly prohibited certain state-court suits from proceeding. *See Mitchum*, 407 U.S. at 234-35 & nn.12-16. The Emergency Price Control Act permitted "a federal district court to enjoin acts that violated or threatened to violate the Act," which was "broad enough to justify an injunction to restrain state court proceedings." *Id.* at 235 n.17. "The very purpose of § 1983 was to interpose the federal courts between the States and the people . . . to protect the people from unconstitutional action under color of state law, whether that action be executive, legislative, or judicial." *Id.* at 242 (quotation marks omitted). Finally, the Clayton Act allowed injunctions of state proceedings when "those proceedings are themselves part of a pattern of baseless, repetitive claims that are being used as an anticompetitive device" in violation of federal antitrust law. *Vendo*, 433 U.S. at 644 (Blackmun, J., concurring) (quotation marks omitted).

## II

In *State Farm*, this Court held that RICO expressly authorizes an injunction of state proceedings that are "a pattern of baseless, repetitive claims that are being used to further a [RICO] violation." 120 F.4th at 97 (cleaned up). That holding misinterpreted the AIA and misread Supreme Court precedent.

### A

Like this case, *State Farm* involved litigation arising out of New York's no-fault car insurance system. *See* N.Y. Ins. Law §§ 5101–5109. Under that system, insurers must compensate accident victims regardless of fault. *See Gov't Emps. Ins. Co. v. Mayzenberg*, --- N.E.3d ---, 2025 WL 3259882, at *1 (N.Y. Nov. 24, 2025). Victims often assign their insurance benefits to health-care providers, who then submit claims for reimbursement to the victim's insurer. The insurer can deny a claim only for narrow reasons, including if the underlying services are medically unnecessary. *Id.* at *5.[2]

In *State Farm*, a group of health-care providers filed 480 state-court benefits suits, alleging that State Farm Mutual Automobile Insurance Company ("State Farm") failed to pay their claims. 120 F.4th at 74. But State Farm alleged that the providers were engaged in a "massive fraudulent scheme." *Id.* at 80. It sued in federal court

---

[2] Insurers can also deny claims if (1) the health-care provider "fails to meet any applicable New York State or local licensing requirement" or (2) the provider "effectively ceded control of their professional services corporation to unlicensed individuals." *Mayzenberg*, 2025 WL 3259882, at *2, 6 (cleaned up).

and argued that RICO "expressly authorized" an injunction of the state proceedings. Even though the state suits were not themselves RICO violations, they "help[ed] to perpetuate and monetize a RICO violation." *Id.* at 91.[3] Each new lawsuit risked giving the health-care providers more funds to attract new patients, to administer more unnecessary care, and to continue their cycle of fraud.

State Farm had several options. It could have defended the 480 cases by arguing the medical care was unnecessary under state law or raised its RICO claim as a counterclaim. *See Tafflin v. Levitt*, 493 U.S. 455, 467 (1990) (state courts have concurrent jurisdiction over civil RICO claims). It also could have paid the claims and then sought "damages or assert[ed] a claim for unjust enrichment." *Mayzenberg*, 2025 WL 3259882, at *5. Finally, State Farm could have reported the medical providers' fraud to New York State, as state law required. *See id.* (citing N.Y. Ins. Law § 5108(c)). This may have resulted in the termination of the state-court suits because the "no-fault statute empowers the State" to "prohibit the [fraudulent] provider from demanding or requesting payment for medical services." *Id.* (quotation marks omitted).

---

[3] *See State Farm*, 120 F.4th at 98 n.14 ("State Farm does not appear to contend that the state-court proceedings here are predicate acts under 18 U.S.C. § 1961(1), but instead that they help further the RICO violation, which consists of a pattern of racketeering activity under the mail fraud statute through other fraudulent activities alleged in the complaint. In other words, the issue is not whether the state-court proceedings are *themselves* predicate acts, but rather that they are allegedly designed to perpetuate and monetize the RICO scheme.").

State Farm did none of these things. Instead, it sought a federal injunction, arguing that it would be ineffective to litigate in state court, where procedural rules "obscure[d] the fraud." *State Farm*, 120 F.4th at 74. State Farm claimed it could not prove the fraudulent scheme in state court because New York law made it difficult to consolidate cases and the fraud would become "apparent only when the claims are analyzed altogether." *Id.* at 80.[4]

---

[4] *State Farm* and the majority adopt that logic in concluding that insurers will suffer "irreparable harm" without an injunction and thus meet the preliminary injunction standard. *See State Farm*, 120 F.4th at 80; *ante* at 15 (GEICO will suffer irreparable harm if it is "unable to successfully assert its global fraud defense" in state-court and arbitration proceedings). But that reasoning is undermined by the New York Court of Appeals's decision in *Mayzenberg*, which clarified that "an insurer may not deny a provider's claim for reimbursement based on alleged professional misconduct." 2025 WL 3259882, at *3. "Professional misconduct" includes the conduct that GEICO alleges was the fraudulent scheme here—*i.e.*, "[p]racticing the profession fraudulently," "[p]ermitting, aiding or abetting an unlicensed person to perform activities requiring a license," giving "any fee or other consideration to or from a third party for the referral of a patient," and "[f]ailing to exercise appropriate supervision over persons who are authorized to practice only under the supervision of the licensee." N.Y. Educ. Law § 6530(2), (11), (18), (33); *see* Joint App'x at 23-24 (GEICO's fraud allegations). So a "global fraud defense," *ante* at 15, is not available to insurers, and they suffer no "irreparable harm" if they cannot assert that defense under state law.

6

**B**

This Court should have concluded that the AIA prohibited the injunction that State Farm sought. The "expressly authorized" exception to the AIA is inapplicable when a federal statute does not prohibit a state case from proceeding. Unlike all of the statutes that the Supreme Court has held "expressly authorize" an injunction, State Farm did not claim that RICO prohibited the state-court suits. *See State Farm*, 120 F.4th at 98 n.14.

Instead, State Farm argued that state courts would reach incorrect *decisions* that would "further [a] RICO violation." *Id.* at 98. Its argument resembled the union's in *Amalgamated Clothing Workers*. Just as the union claimed that state courts would reach a decision contrary to the Taft-Hartley Act, State Farm argued that "state courts are unlikely to even recognize the alleged massive RICO scheme" and thus would reach decisions contrary to RICO. *Id.* In both cases, the "assumption upon which the argument [for an injunction] proceeds is that federal rights will not be adequately protected in the state courts." *Amalgamated Clothing Workers*, 348 U.S. at 518.

But that assumption contradicts the AIA's "core message . . . of respect for state courts." *Smith*, 564 U.S. at 306. Unless Congress prohibits the state proceedings from continuing, we must have "confidence in the state courts" and their decisions. *Amalgamated Clothing Workers*, 348 U.S. at 518.

**C**

*State Farm* misread *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977), when it held that RICO "expressly authorized" an injunction.

7

In *Vendo*, a state court ruled that Lektro-Vend had violated noncompete agreements. *See id.* at 627 n.2. But Lektro-Vend claimed that the agreements were unreasonable restraints of trade that violated the Clayton Act, so it asked a federal court to enjoin the state-court judgment, arguing that the Clayton Act "expressly authorized" an injunction. *Id.* at 627, 630.

The controlling decision was Justice Blackmun's concurrence, which concluded that the Clayton Act "expressly authorize[s]" injunctions "under narrowly limited circumstances." *Id.* at 643-44 (Blackmun, J., concurring). He explained that, "consistent[] with the decision in *California Motor Transport Co. v. Trucking Unlimited*, . . . no injunction may issue against currently pending state-court proceedings unless those proceedings are themselves part of a 'pattern of baseless, repetitive claims' that are being used as an anticompetitive device." *Id.* at 644 (citation omitted). Justice Blackmun concluded that the Clayton Act did not authorize an injunction in *Vendo* because Vendo was not using "the state-court proceeding as an anticompetitive device in and of itself." *Id.* at 645.

*California Motor Transport* had held that a "pattern of baseless, repetitive claims" can constitute a conspiracy to restrain trade under the Clayton Act. 404 U.S. 508, 513 (1972).[5] So by concluding that the

---

[5] That holding was an exception to the rule that "[t]hose who petition government for redress are generally immune from antitrust liability." *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993). A "pattern of baseless, repetitive" claims is thus an antitrust-specific term referring to "sham" judicial proceedings that may themselves violate the antitrust laws. *Id.* at 57-59.

Clayton Act authorizes an injunction only when state proceedings are "part of a pattern of baseless, repetitive claims," Justice Blackmun was saying that the Clayton Act authorizes an injunction only when a series of state proceedings "in and of itself" violates the Clayton Act. *Vendo*, 433 U.S. at 644-45 (Blackmun, J., concurring) (quotation marks omitted). That holding tracks the Supreme Court's precedents that a statute must prohibit the continuation of state proceedings to "expressly authorize" an injunction.

*State Farm* misread the words "pattern of baseless, repetitive claims." Overlooking the special significance of that phrase in antitrust law, *State Farm* interpreted Justice Blackmun's concurrence to hold that the "expressly authorized" exception applies when "a pattern of baseless, repetitive claims . . . further[s] a violation of a federal statute." 120 F.4th at 94 (quotation marks omitted). So it authorized the injunction of 480 state-court suits as a "pattern of baseless, repetitive claims" furthering an alleged RICO violation. *Id.* at 98. That holding departed from the well-established rule that a federal statute must prohibit the continuation of state proceedings to "expressly authorize" an injunction.

**III**

Although *State Farm* controls this case, it should be read narrowly. First, *State Farm* described itself as "limited to the unusual circumstances [of] a massive scheme including hundreds of purportedly meritless state-court proceedings that help further a RICO violation." 120 F.4th at 99; *see also id.* at 97 ("[T]he narrow path carved by *Vendo* applies only in rare circumstances."). So it does not suggest that any federal statute may authorize injunctions of

9

"baseless, repetitive claims."  It remains open whether statutes other than RICO authorize injunctions of a "pattern of baseless, repetitive claims," or whether RICO itself authorizes an injunction when a pattern of claims does not involve hundreds of cases. [6]

Second, *State Farm* does "not question or qualify in any way the principles of equity, comity, and federalism that must restrain a federal court when asked to enjoin a state court proceeding." *Mitchum*, 407 U.S. at 243.  Courts should not act in the "absence of the factors necessary under equitable principles to justify federal intervention." *Younger v. Harris*, 401 U.S. 37, 54 (1971).

The recent decision of the New York Court of Appeals in *Mayzenberg* makes clear that equitable principles militate against state-court injunctions in cases like this one.  *Mayzenberg* explained that the judicial process is not insurers' primary recourse when they receive fraudulent no-fault claims.  *See* 2025 WL 3259882, at *5.  New York's legislature has enacted a "carefully crafted statutory framework" that vests authority for "guilt and adequate punishment for professional misconduct," including fraud, in the State's Board of Regents.  *Id.* at *6.  It "requires every insurer to report" fraudulent conduct to the State and empowers the State to "prohibit the provider from demanding or requesting payment for medical services." *Id.* at *5 (quotation marks omitted).  The statute's purpose is to ensure that

---

[6] Recently, some courts have read *State Farm* as "enabling district courts to enjoin ongoing state-court collections proceedings."  *Gov't Emps. Ins. Co. v. Akiva Imaging Inc.*, No. 1:24-CV-6549, 2025 WL 1434297, at *2 (E.D.N.Y. May 19, 2025).  *State Farm* did not reach that broad conclusion.

insurers cannot "delay and deny no-fault payments" without the State's intervention. *Id.* at *6.

Enjoining state proceedings when insurers—including GEICO here—have not sought recourse from the State violates the principles of federalism and comity. *See Mitchum*, 407 U.S. at 243. Federal courts should "seek to avoid needless conflict with state agencies and withhold relief by way of injunction where state remedies are available and adequate." *Cap. Serv. v. NLRB*, 347 U.S. 501, 504 (1954).

**IV**

I concur in the judgment because we are bound by our decision in *State Farm*. But *State Farm*'s analysis of the "expressly authorized" exception to the AIA departed from Supreme Court precedent and should be read narrowly.

11